## Geary, Appellant, v. United States Steel Corporation.

Argued September 26, 1972. Before JONES, C. J., EAGEN, O'BRIEN, ROBERTS, POMEROY, NIX and MANDERINO, JJ.

*Paul H. Titus*, with him *Bernard D. Marcus*, and *Kaufman & Harris*, for appellant.

*Paul A. Manion,* with him *Thomas R. Wright, Vincent L. Matera, William L. White, Jr.,* and *Reed, Smith, Shaw & McClay,* for appellee.

OPINION BY MR. JUSTICE POMEROY, March 25, 1974:

This appeal comes to us from an order of the trial court sustaining appellee's preliminary objections in the nature of a demurrer and dismissing with prejudice appellant's amended complaint in trespass. The Superior Court affirmed *per curiam,* without opinion, and we granted allocatur to consider the novel and far-reaching arguments advanced by appellant in support of his alleged cause of action.[1]

The complaint avers that appellant, George B. Geary, was continuously employed by appellee, United States Steel Corporation (hereinafter "company"), from 1953 until July 13, 1967, when he was dismissed from his position. Geary's duties involved the sale of tubular products to the oil and gas industry. His employment was at will. The dismissal is said to have stemmed from a disagreement concerning one of the company's new products, a tubular casing designed for use under high pressure. Geary alleges that he believed the product had not been adequately tested and constituted a serious danger to anyone who used it; that he voiced his misgivings to his superiors and was ordered to "follow directions", which he agreed to do; that he nevertheless continued to express his reservations, taking his case to a vice-president in charge of sale of the product; that as a result of his efforts the product was reevaluated and withdrawn from the

---

[1] No opinion in support of the order dismissing the complaint was filed by the trial judge in accordance with Superior Court Rule 46. In a post-argument statement submitted under Supreme Court Rule 34, counsel for appellant has admitted the possibility that the required notice of appeal was never served on the trial judge.

market; that he at all times performed his duties to the best of his ability and always acted with the best interests of the company and the general public in mind; and that because of these events he was summarily discharged without notice. Geary asserts that the company's conduct in so acting was "wrongful, malicious and abusive," resulting in injury to his reputation in the industry, mental anguish, and direct financial harm, for which he seeks both punitive and compensatory damages.[2]

The case having been dismissed on a demurrer, all properly pleaded facts are taken as admitted for the purpose of testing the sufficiency of the complaint. *Balsbaugh v. Rowland,* 447 Pa. 423, 290 A.2d 85 (1972); *Engel v. Parkway Co.,* 439 Pa. 559, 266 A.2d 685 (1970); *Fawcett v. Monongahela R. Co.,* 391 Pa. 134, 137 A.2d 768 (1958).[3]

Appellant candidly admits that he is beckoning us into uncharted territory. No court in this Commonwealth has ever recognized a non-statutory cause of action for an employer's termination of an at-will employment relationship. What scant authority there is on the subject points the other way. In *Henry v. Pittsburgh & Lake Erie Railroad Co.,* 139 Pa. 289, 21 A. 157 (1891), a railroad employee was suspended because of alleged irregularities in his department. Al-

---

[2] Following his discharge Geary filed a claim for unemployment benefits with the Bureau of Employment Security. The Unemployment Compensation Board of Review found that Geary was not guilty of willful misconduct in the company's employ, and allowed the claim. A copy of the Board's decision and order is attached to and made a part of the complaint herein.

[3] The company in its brief denies that the new product was withdrawn from the market as a result of Geary's efforts, and has offered to prove that it has been marketed successfully without incident for several years. This factual contention is irrelevant at the preliminary objection stage.

though cleared in a subsequent investigation, he was refused reinstatement. He sued his employer, alleging that he was discharged "maliciously and without probable cause". 139 Pa. at 290. Sustaining the entry of a compulsory non-suit, Chief Justice PAXSON said for the Court: "The right [to discharge the plaintiff] was not, and could not well be disputed, without a greater shock to the relations of employer and employee than we are disposed to sanction. A railroad corporation, or an individual, may discharge an employee with or without cause, at pleasure, unless restrained by some contract; so that I do not see that the questions of malice and want of probable cause have anything to do with the case." 139 Pa. at 297. The principle of the *Henry* case was recently recognized in a federal court as the law of this Commonwealth. *McKinney v. Armco Steel Corp.*, 270 F. Supp. 360 (W.D. Pa. 1967).

The Pennsylvania law is in accordance with the weight of authority elsewhere. Absent a statutory or contractual provision to the contrary, the law has taken for granted the power of either party to terminate an employment relationship for any or no reason.[4] This power of termination is explicitly recognized in the Restatement of Torts, §762, Privilege of Selecting Persons for Business Relations: "One who causes intended or unintended harm to another merely by refusing to enter into a business relation with the other or to con-

[4] *See, e.g., Pearson v. Youngstown Sheet & Tube Co.*, 332 F.2d 439 (7th Cir. 1964), *cert. denied*, 379 U.S. 914; *Hablas v. Armour & Co.*, 270 F.2d 71 (8th Cir. 1959); *Odell v. Humble Oil & Refining Co.*, 201 F.2d 123 (10th Cir. 1953), *cert. denied*, 345 U.S. 941; *May v. Santa Fe Trail Transportation Co.*, 189 Kan. 419, 370 P.2d 390 (1962); *Jorgensen v. Pennsylvania R. Co.*, 25 N.J. 541, 138 A.2d 24, 72 A.L.R. 2d 1415 (1958); *Comerford v. International Harvester Co.*, 235 Ala. 376, 178 So. 894 (1938). *See generally* 53 Am. Jur. 2d *Master & Servant* §§34, 43 (1970).

tinue a business relation terminable at his will is not liable for that harm if the refusal is not (a) a breach of the actor's duty to the other arising from the nature of the actor's business or from a legislative enactment, or (b) a means of accomplishing an illegal effect on competition, or (c) part of a concerted refusal by a combination of persons of which he is a member."[5]

We recognize that economic conditions have changed radically since the time of *Henry v. Pittsburgh & Lake Erie Railroad Co., supra.* The huge corporate enterprises which have emerged in this century wield an awesome power over their employees. It has been aptly remarked that "[w]e have become a nation of employees. We are dependent upon others for our means of livelihood, and most of our people have become completely dependent upon wages. If they lose their jobs they lose every resource, except for the relief supplied by the various forms of social security. Such dependence of the mass of the people upon others for *all* of their income is something new in the world. For our generation, the substance of life is in another man's hands."[6]

---

[5] Comment (c) to this section states that "the privilege stated in this Section exists regardless of the actor's motive for refusing to enter business relations with the other and even though the sole motive is a desire to harm the other"; comment (d) makes it clear that "the rule applies to refusals between . . . employer and employee. . . ." At the risk of belaboring the obvious, we note that none of the enumerated exceptions applies to appellant. The "duty to the other arising from the nature of the actor's business" in clause (a) refers to the special rules governing public utilities. *See* Restatement of Torts, §763. None of the American Law Institute's tentative drafts of the Restatement (Second) of Torts deals directly with §762, and so far as appears, no change is presently contemplated in this section.

[6] F. Tannenbaum, A Philosophy of Labor 9 (1951), quoted in Blades, *Employment at Will vs. Individual Freedom: On Limiting the Abusive Exercise of Employer Power,* 67 Colum. L. Rev. 1404

Against the background of these changes, the broad question to which appellant invites our attention is whether the time has come to impose judicial restrictions on an employer's power of discharge.

Appellant points first to the long-established tort of unjustified interference with prospective advantage. *See* Restatement of Torts, §766 (1939) and Restatement (Second) of Torts, §§766A and 766B (Tentative Draft No. 14, 1969). He argues that the expectancies which the law protects from interference by outsiders should also be protected against the parties to the relationship. The courts of this Commonwealth have held that both employers and employees are entitled to freedom from meddling by third parties, even where the employment is at will. *Dorrington v. Manning*, 135 Pa. Superior Ct. 194, 4 A.2d 886 (1939); *Padden v. Local 90 United Ass'n of Journeymen Plumbers*, 168 Pa. Superior Ct. 611, 82 A.2d 327 (1951). But we do not think that the cases imposing liability on strangers to the protected relationship are apposite to the instant situation. A predicate to liability in such a case is "the absence of privilege or justification on the part of the actor. . . ." *Glenn v. Point Park College*, 441 Pa. 474, 480, 272 A.2d 895, 898 (1971). Here, as in the *Glenn* case, the complaint does not negate the existence of a privilege, hitherto regarded as virtually absolute, insulating the company's termination of Geary's employment. Instead, we are asked to impose limitations on this privilege for reasons of policy. The cases involving interference by third parties, turning as they do on the presence or absence of privileges of a different sort, do not seem particularly helpful in evaluating this proposal.

As an operational principle for restricting an employer's power of discharge, appellant suggests the

(1967) (emphasis in original deleted). *See also* Comment, *Towards a Property Right in Employment*, 22 Buffalo L. Rev. 1081 (1973).

rationale of cases imposing liability on the actor on the basis of his motive. While this theory is "on the frontier of the law of tort,"[7] it received recognition in Pennsylvania at an early date. *See, e.g., Sommer v. Wilt*, 4 S. & R. 19 (1818) (abuse of process) ; *Wheatley v. Baugh*, 25 Pa. 528 (1855) (dicta; deprivation of water rights). The conduct recognized as tortious in cases of this sort necessarily involves an element of specific intent to cause harm or accomplish an ulterior purpose. Thus in *American Bank & Trust Co. v. Federal Reserve Bank*, 256 U.S. 350, 65 L.Ed. 983 (1921), a case relied on by appellant, independent banks were held to have a cause of action against a federal reserve bank which accumulated checks drawn against the plaintiffs for the purpose of forcing them to join the federal reserve system. The right of a holder to present checks for payment was not questioned, but the exercise of that right in a particular manner and for a particular end was held to be impermissible. By the same token, the novel theory of recovery which appellant advances must surely involve specific intent on the part of the company to harm Geary or achieve some other proscribed goal. If a general intent, in the sense that an employer knew or should have known the probable consequences of his act, were all that a disgruntled employee need show in order to make out a cause of action, the privilege of discharge would be effectively eradicated, for some degree of harm is normally foreseeable whenever an employee is dismissed.[8] Appellant purports not to seek a result so

[7] 1 Harper & James, The Law of Torts, §4.10 (1956).

[8] By the same token, some degree of harm, however minimal, is generally foreseeable whenever any employee voluntarily leaves his job. The theory of malicious abuse of recognized rights is, of course, available to all litigants, including employers as well as employees. Were we to recognize a right of action in this area which did not include the strict requirement of specific intent, it

drastic; he merely argues that a court should recognize the abuse of the privilege in a particular instance, and grant damages accordingly. To this extent, appellant's proffered analogy to cases involving the malicious abuse of recognized rights seems apt enough. The difficulty is that the averments of Geary's complaint do not add up to specific intent.

Here again our decision in the case of *Glenn v. Point Park College, supra,* offers useful guidance. We there dealt with an allegation of interference by a third party in a prospective business relationship: an unconsummated real estate brokerage arrangement. Following the tentative draft of §766A of the Restatement (Second) of Torts, we held that where the relationship allegedly interfered with is prospective rather than existing, specific intent on the part of the defendant to cause harm to the plaintiff must be alleged to make out a cause of action. Examining Glenn's complaint, we found it deficient in this respect. The complaint averred that, relying on information supplied by the plaintiff brokers, defendant had negotiated a direct purchase of real estate, representing to the vendor that no brokers were involved in the transaction. It was alleged that in this manner defendant had intentionally and maliciously prevented plaintiffs from entering into a brokerage arrangement with the vendor, thereby depriving them of their commissions. In ruling that the complaint fell short of charging an intent to cause harm to plaintiffs, we made it clear that a bare recitation that defendant had acted "intentionally, wrongfully, maliciously, fraudulently, deceitfully and without justification" did not satisfy the specific intent requirement.

---

might have the ironic result of giving employers a potent weapon with which to harass key employees who wish to change jobs.

We think that the deficiency of the complaint in the instant case is even clearer than it was in the *Glenn* case. The facts alleged show only that there was a dispute over the merits of the new product; that Geary vigorously expressed his own point of view in the matter, by-passing his immediate superiors and taking his case to a company vice-president, and that he was ultimately discharged. There is nothing here from which we could infer that the company fired Geary for the specific purpose of causing him harm, or coercing him to break any law[9] or otherwise to compromise himself. According to his own averments, Geary had already won his own battle within the company.[10] The most natural inference from the chain of events recited in the complaint is that Geary had made a nuisance of himself, and the company discharged him to preserve administrative order in its own house. This hardly amounts to an "ulterior purpose", much less to "disinterested malevolence", in the sense in which those terms are used by Mr. Justice HOLMES in the *American Bank & Trust Co.* case, *supra*. Under his own theory, therefore, appellant has failed to state a claim upon which relief can be granted.[11]

---

[9] Appellant suggests in his brief that continued sale of the defective product might have entailed both criminal and civil liability. This is mere speculation, particularly since the product was allegedly withdrawn from the market.

[10] ". . . As a result of re-evaluation at plaintiff's insistence, the program was withdrawn." Complaint, Par. 8.

[11] In the *Glenn* case, we granted the plaintiff an opportunity to amend his complaint. Here, however, we think it clear from the face of Geary's already once-amended complaint that any further attempt to amend would be unavailing. "Amendment of a complaint should be freely allowed, and a claim ought not to be jeopardized by minor defects in pleading or technical errors of counsel. But liberality of pleading does not encompass a duty in the courts to allow successive amendments when the initial pleading indicates that the claim asserted cannot be established." *Behrend v. Yellow Cab Co.*, 441 Pa. 105, 110, 271 A.2d 241 (1970).

Appellant's final argument is an appeal to considerations of public policy. Geary asserts in his complaint that he was acting in the best interests of the general public as well as of his employer in opposing the marketing of a product which he believed to be defective. Certainly, the potential for abuse of an employer's power of dismissal is particularly serious where an employee must exercise independent, expert judgment in matters of product safety,[12] but Geary does not hold himself out as this sort of employee. So far as the complaint shows, he was involved only in the sale of company products. There is no suggestion that he possessed any expert qualifications, or that his duties extended to making judgments in matters of product safety. In essence, Geary argues that his conduct should be protected because his intentions were good. No doubt most employees who are dismissed from their posts can make the same claim. We doubt that establishing a right to litigate every such case as it arises would operate either in the best interest of the parties or of the public.

Given the rapidity of change in corporate personnel in the areas of employment not covered by labor agreements, suits like the one at bar could well be expected to place a heavy burden on our judicial system in terms of both an increased case load and the thorny problems of proof which would inevitably be presented. We agree with appellant, however, that these considerations do not in themselves justify denying a legal forum to a plaintiff with a justiciable claim. *See Niederman v. Brodsky,* 436 Pa. 401, 261 A.2d 84 (1970). Of greater concern is the possible impact of such suits on the legitimate interests of employers in hiring and retaining the best personnel available. The ever-present threat of suit might well inhibit the making of critical

---

[12] *See* Blades, *supra,* note 6, at 1408 note 22.

judgments by employers concerning employee qualifications.[18]

The problem extends beyond the question of individual competence, for even an unusually gifted person may be of no use to his employer if he cannot work

---

[18] Professor Blades has analyzed some of the difficulties in this area: "Ordinarily, where both sides present equally credible versions of the facts, the plaintiff will have failed to carry his burden. However, there is the danger that the average jury will identify with, and therefore believe, the employee. This possibility could give rise to vexatious lawsuits by disgruntled employees fabricating plausible tales of employer coercion. If the potential for vexatious suits by discharged employees is too great, employers will be inhibited in exercising their best judgment as to which employees should or should not be retained. . . . Compromise of the employer's power to make such judgments about professional, managerial or other high-ranking employees . . . is especially undesirable. The higher ranking the employee, the more important to the success of the business is his effective performance. Compounding the potential for undue inhibition of the employer's judgment at the higher echelons of employment is the greater difficulty of articulating the basis for a discharge at that level. Compared to the wage earner, whose routine duties can generally be measured against a mechanical standard, the value of a salaried employee is more likely to be measured in such intangible qualities as imagination, initiative, drive, and personality. The employer's evaluation of the higher ranking employee is usually a highly personalized, intuitive judgment, and, as such, is more difficult to translate into concrete reasons which someone else—a juryman—can readily understand and appreciate. Indeed, even if it is conceded that the protection from unwarranted discharges afforded rank and file employees by labor agreements is appropriate, it might still be argued that no intrusion of any kind upon the employer's subjective evaluation of higher echelon employees should be tolerated." Blades, op. cit. *supra*, note 6, at 1428-9. Professor Blades nevertheless favors judicial intervention to protect employees at all levels from abusive discharge, partly in the hope that ". . . a lack of confidence in courts and juries could lead, albeit in a roundabout way, to the creation of private means of settlement that might well be the most effective and expeditious way of handling such cases." *Id.* at 1431.

effectively with fellow employees. Here, for example, Geary's complaint shows that he by-passed his immediate superiors and pressed his views on higher officers, utilizing his close contacts with a company vice president.[14] The praiseworthiness of Geary's motives does not detract from the company's legitimate interest in preserving its normal operational procedures from disruption.[15] In sum, while we agree that employees should be encouraged to express their educated views on the quality of their employer's products, we are not persuaded that creating a new non-statutory cause of action of the sort proposed by appellant is the best way to achieve this result. On balance, whatever public policy imperatives can be discerned here seem to militate against such a course.[16]

[14] ". . . [T]he claimant was critical of the program and objected to his superiors. . . . [He] was ordered to follow directions and agreed that he would do so even though he was still opposed to the program. . . . [He] took the problem to a vice president of the company with whom he was in close contact and as a result of re-evaluation the program was withdrawn. . . ." Findings of Fact of Unemployment Compensation Board, attached to and made a part of the amended complaint as Exhibit "A". In pursuing this course, Geary exceeded any duty imposed on him under the rule of the Restatement (Second) of Agency §381: Duty to Give Information, cited in the dissenting opinion. We do not conceive that §381 bears any relation to the case before us.

[15] We see no basis for inferring that Geary's discharge was a spiteful retaliatory gesture designed to punish him for noticing and calling attention to the asserted defect in the company's product. This is particularly true in view of the fact that the product was withdrawn from the market. It does not follow that, because Geary's motives were good, the company's motives in discharging him were bad. In scrutinizing the complaint we are not required to put aside our common sense or attribute to parties a perversity which the facts alleged do not warrant.

[16] *Compare, Petermann v. International Brotherhood of Teamsters*, 174 Cal. App. 2d 184, 344 P.2d 25 (1959), a case relied on by appellant, in which a non-statutory cause of action in an employee

It may be granted that there are areas of an employee's life in which his employer has no legitimate interest.  An intrusion into one of these areas by virtue of the employer's power of discharge might plausibly give rise to a cause of action, particularly where some recognized facet of public policy is threatened.  The notion that substantive due process elevates an employer's privilege of hiring and discharging his employees to an absolute constitutional right has long since been discredited.[17]  But this case does not require us to define in comprehensive fashion the perimeters of this privilege, and we decline to do so.  We hold only that where the complaint itself discloses a plausible

dismissed for his refusal to commit perjury was recognized on public policy grounds.  More recently, the Supreme Court of Indiana reached a similar result in the case of an employee who was discharged because she filed a claim against her employer under Indiana's workmen's compensation statute.  *Frampton v. Central Indiana Gas Co.*, 297 N.E.2d 425 (Ind. 1973).  The California courts have limited the application of *Petermann* to cases where there has been an explicit declaration of public policy by the legislature.  *See, Glenn v. Clearman's Golden Cock Inn, Inc.*, 192 Cal. App. 2d 793, 13 Cal. Rptr. 769 (1961) and *Montalvo v. Zamora*, 7 Cal. App. 3rd 69, 86 Cal. Rptr. 401 (1970), with which *Mallard v. Boring*, 182 Cal. App. 2d 390, 6 Cal. Rptr. 171 (1960) and *Patterson v. Philco Corp.*, 252 Cal. App. 2d 63, 60 Cal. Rptr. 110 (1967) should be compared.  The Indiana Supreme Court's holding in *Frampton* was equally narrow: "We agree with the Court of Appeals that, under ordinary circumstances, an employee at will may be discharged without cause.  However, when an employee is discharged solely for exercising a statutorily conferred right an exception to the general rule must be recognized."  297 N.E.2d at 428.  It is not necessary to reject the rationale of these decisions in order to defend the result we reach here.  In each case where a cause of action was found, the mandates of public policy were clear and compelling; that cannot be said of the instant case.

[17] *Compare, Lincoln Federal Labor Union v. Northwestern Iron & Metal Co.*, 335 U.S. 525, 93 L.Ed. 212 (1949) with *Adair v. United States*, 208 U.S. 161, 52 L.Ed. 436 (1908) and *Coppage v. Kansas*, 236 U.S. 1, 59 L.Ed. 441 (1915).

and legitimate reason for terminating an at-will employment relationship and no clear mandate of public policy is violated thereby, an employee at will has no right of action against his employer for wrongful discharge.

Order affirmed.

Mr. Justice NIX dissents.

Mr. Justice MANDERINO dissents.

---

DISSENTING OPINION BY MR. JUSTICE ROBERTS:

I cannot accept the view implicit in the majority's decision that today's jurisprudence is so lacking in awareness and vitality that our judicial process is incapable of affording relief to a responsible employee for an arbitrary and retaliatory discharge from employment. I dissent.

For fourteen years appellant George B. Geary served the United States Steel Corporation as a salesman. Abruptly, on July 13, 1967, he was summarily discharged without cause or notice. The majority now holds "that where the complaint itself discloses a plausible and legitimate reason for terminating an at-will employment relationship and no clear mandate of public policy is violated thereby, an employee at will has no right of action against his employer for wrongful discharge." I am unable to agree that this case presents only "a plausible and legitimate reason for terminating" Geary's employment or that "no clear mandate of public policy" has been violated.

In the particular circumstances of this case, appellant's discharge demonstrates the arbitrary dismissal power exercisable by an employer. The managers of this publicly-held corporation determined that George B. Geary should be dismissed because he called to the attention of his superiors that the steel pipe manufactured by his employer and which Geary was required to sell was a defective and dangerous product.

His suggestion that the unsafe steel pipe be withdrawn from the market to protect both the public from danger and his employer from liability was in complete harmony with his employer's best interest. Nevertheless, Geary was discharged.

As a salesman, Geary was required to know intimately the products he was selling. He represented United States Steel and it was expected that he would be alert to protect his employer's reputation. Likewise, it was natural that he would seek to shield himself and his employer from the consequences of a dangerous product. When he correctly recognized that the defective steel pipe had strong potential for causing injury and damage, he immediately notified his superiors. His reward for loyalty was dismissal. Of course, had Geary not informed his superiors of the defective product, he may well have been discharged for his failure to do so.

Geary's assessment of the danger of the steel pipe was correct, since after his notification, the corporation removed the steel pipe from the market.[1] On these pleadings, it is manifestly clear that the employer realized Geary was right and that its interest lay in withdrawing from the market the dangerous product. Despite Geary's candor in seeking within the corporate family to advance the corporation's best interest, his employer fired him.

---

[1] A demurrer to a complaint admits as true all well-pleaded facts and all inferences reasonably deducible from them, but not any conclusions of law. *Reardon v. Wilbur*, 441 Pa. 551, 554, 272 A.2d 888, 890 (1971) ; *Clevenstein v. Rizzuto*, 439 Pa. 397, 400-01, 266 A.2d 623, 624-25 (1970) ; *Hoffman v. Misericordia Hospital*, 439 Pa. 501, 503-04 267 A.2d 867, 868 (1970). Therefore, at this stage of the pleadings this Court is bound to accept as true Geary's allegation that the steel pipe was in fact withdrawn from the market by U. S. Steel.

There is no doubt that strong public policies of this Commonwealth have been offended by Geary's discharge. First, the product asserted by appellant to be defective was, after appellant notified his superiors, withdrawn from the market. The manufacture and distribution of defective and potentially dangerous products does not serve either the public's or the employer's interest. Our courts have granted relief to those injured by defective merchandise. E.g., *Kassab v. Central Soya*, 432 Pa. 217, 246 A.2d 848 (1968); *Webb v. Zern*, 422 Pa. 424, 220 A.2d 853 (1966). See Restatement (Second) of Torts § 402A (1965). The majority, however, fails to perceive that the prevention of injury is a fundamental and highly desirable objective of our society.

Second, appellant as an employee was "subject to a duty to use reasonable efforts to give his [employer] information which is relevant to affairs entrusted to him, and which, as the [employee] has notice, the [employer] would desire to have and which can be communicated without violating a superior duty to a third person." Restatement (Second) of Agency § 381 (1958). Had Geary refrained from notifying his superiors of the defective product, he could have been discharged for violating this duty to come forward with information. No responsible policy is served which permits an employee to be discharged solely for obeying his legal duty to communicate information to his superiors. Indeed, the policy underlying this duty to communicate is frustrated by denying Geary the opportunity to present his case to the court.

The majority admits, as it must, that precedents barring a cause of action for wrongful discharge are "scant" and that "economic conditions have changed radically" since the date of the only Pennsylvania case on point. *Henry v. Pittsburgh & L.E.R.R.*, 139 Pa. 289,

21 A. 157 (1891). Unlike the majority, I believe the time has surely come to afford unorganized employees an opportunity to prove in court a claim for arbitrary and retaliatory discharge.

The majority concedes the employment relationship is a proper subject for judicial action. Still, it refuses to afford Geary the opportunity to establish his claim of wrongful discharge. The majority justifies its refusal to act by assuming that to recognize a cause of action on the facts alleged will unleash "an increased case load and . . . thorny problems of proof," and by further assuming that these problems will plague our judicial system. The majority's thinking is nothing more than an unarticulated fear of the mythological Pandora's box. Not only are both assumptions unwarranted, but the majority fails to perceive the realities of twentieth century industrial organization. The reality is that recognizing a cause of action for wrongful discharge in these circumstances will help to check a serious menace in our society, the arbitrary dismissal power of employers.

The genius of the common law is that the case-by-case analysis permits opening and closing of the door to the courtroom. "[I]n view of the fact that from the day Magna Charta was signed to the present moment, amendments to the structure of the law have been made with increasing frequency, it is impossible to suppose that they will not continue, and the law be forced to adapt itself to new conditions of society, and, particularly, to the new relations between employers and employes, as they arise." *Holden v. Hardy,* 169 U.S. 366, 387, 18 S. Ct. 383, 386 (1898). In my judgment, the assertion that appellant should be denied relief because his case represents the opening wedge of a theory which might produce further litigation is an inappropriate judicial consideration. *Niederman v. Brodsky,* 436 Pa. 401, 412-13, 261 A.2d 84, 89 (1970).

It would, however, be misleading to imply that docket considerations alone account for the majority's reticence. "Of greater concern [to the majority] is the possible impact of such suits on the legitimate interests of employers in hiring and retaining the best personnel available." The instant case itself illustrates the fallacy of this argument. If the existence of the tort of wrongful discharge in these circumstances (assuming, as we must, the truth of all facts alleged) will keep employees like George Geary on corporate payrolls, both the employer's and the public's interest will have been served. Affording relief for arbitrary and retaliatory discharge in no way impinges upon the employer's right to discharge for cause. That difficult line-drawing may be involved is of no great moment, since courts are daily confronted with the task of separating wheat from chaff.[2]

---

[2] To support its argument that the legitimate interests of employers in hiring and retaining the best personnel available would be compromised by granting appellant an opportunity to prove his claim of wrongful discharge, the majority quotes extensively from Blades, Employment at Wills vs. Individual Freedom: On Limiting the Abusive Exercise of Employer Power, 67 Colum. L. Rev. 1404, 1428-29 (1967). It is true that Professor Blades speaks of the problems of proof and the potential for unjustified suits if a cause of action for wrongful discharge is recognized by the courts. However, Professor Blades unqualifiedly endorses the idea of a cause of action for wrongful discharge. Immediately following that portion of his article quoted by the majority (see note 13 of majority opinion), Professor Blades concludes. "But this argument [that there should be no judicial review of an employer's necessarily subjective evaluation of higher-echelon employees], when viewed against the strong interest in protecting the freedom and integrity of all employees, has force only if the sanctity of the normal right of discharge would be seriously impaired by unfounded claims of employer coercion. The problem of proof is not insurmountable, for there are a number of evidentiary techniques available to the courts by which the genuineness of a claim might be reasonably guaranteed and serious in-

As professor Lawrence E. Blades has noted, "[t]he industrial revolution made an anacronism of the absolute right of discharge by destroying the classical ideal of complete freedom of contract upon which it is based." Blades, Employment at Will vs. Individual Freedom: On Limiting the Abusive Exercise of Employer Power, 67 Colum. L. Rev. 1404, 1418 (1967). Further, although a single nineteenth-century Pennsylvania case[3] stated that an employer can dismiss an employee with or without cause, it does not necessarily follow that this right is absolute and unrestrained. "[T]he word right is one of the most deceptive of pitfalls; it is so easy to slip from a qualified meaning in the premise to an unqualified one in the conclusion. Most rights are qualified." *American Bank & Trust Co. v. Federal Reserve Bank*, 256 U.S. 350, 358, 41 S. Ct. 499, 500 (1921) (Holmes, J.).

It is public policy which here qualifies the "right." See id. at 359, 41 S. Ct. at 501. When a seemingly-absolute right or the conditions of an existing relationship are contrary to public policy then a court is obligated to qualify that right in light of current reality. See *Burne v. Franklin Life Insurance Co.*, 451 Pa. 218, 301 A.2d 799 (1973). Here, the employment relationship, as the majority and Geary's employer view it, clashes with the public's interest in keeping dangerous products from being sold and used.

The Supreme Court of Indiana has recently provided a discharged employee an opportunity to prove a claim for wrongful and retaliatory discharge. *Frampton v. Central Indiana Gas Co.*, 297 N.E. 2d 425 (Ind. 1973).[4] There, the plaintiff was dismissed

---

fringement of the employer's normal right of discharge avoided." Blades, supra at 1429.

3 *Henry v. Pittsburgh & L.E.R.R.*, 139 Pa. 289, 21 A. 157 (1891).

4 An analogous situation is presented by recent accomodations to the near-absolute right of landlords to evict tenants. The United

after she filed a claim for workmen's compensation. The Indiana court observed that "[i]f employers are permitted to penalize employees for filing workmen's compensation claims, a most important public policy will be undermined." 297 N.E.2d at 427. A California court similarly recognized a cause of action for wrongful discharge where the employee had been dismissed after he refused to commit perjury. *Petermann v. Teamsters Union,* 174 Cal. App. 2d 184, 344 P.2d 25 (1959).[5]

The principle underlying these decisions should apply to the present case. Contrary to the majority's assertion, society's interest in protecting itself from dangerous products manifestly presents a mandate to the court to recognize a cause of action for wrongful discharge. That a loyal and responsible employee should be summarily and without cause or notice discharged for complying with his duty to communicate relevant information to his superiors provides further justification for affording appellant an opportunity to present his claim. That appellant was discharged without

States Court of Appeals for the District of Columbia has held that "while the landlord may evict for any legal reason or for no reason at all, he is not, we hold, free to evict in retaliation for his tenant's report of housing code violations to the authorities." *Edwards v. Habib,* 397 F.2d 687, 699 (D.C. Cir. 1968).

[5] The majority attempts to distinguish *Petermann v. Teamsters Union,* 174 Cal. App. 2d 184, 344 P.2d 25 (1959), and cases following it by asserting that recovery has been limited to instances in which an explicit declaration of public policy has been made by the legislature. For this proposition, the majority cites *Montalvo v. Zamora,* 7 Cal. App. 3d 69, 86 Cal. Rptr. 401 (1970) ; *Patterson v. Philco Corp.,* 252 Cal. App. 2d 63, 60 Cal. Rptr. 110 (1967) ; *Glenn v. Clearman's Golden Cock Inn, Inc.,* 192 Cal. App. 2d 793, 13 Cal. Rptr. 769 (1961) ; *Mallard v. Boring,* 182 Cal. App. 2d 390, 6 Cal. Rptr. 171 (1960). Though this statement may not be factually inaccurate, it in no way precludes this Court from noticing and acting upon dictates of public policy whether the Legislature has or has not yet acted.

cause for doing that which, had he failed to do, he would have been subject to dismissal with cause amply demonstrates the illogic of the majority's refusal to recognize in these circumstances a cause of action for wrongful discharge

Our society has long been apprehensive of the arbitrary dismissal power of employers, and has sought through various solutions to remedy the problem.[6] To countervail employers' dismissal power, unions were created.[7] Congress has sought to safeguard certain classes of employees from wrongful and capricious discharges.[8] And our Legislature has decided that certain state employees must be guarded from the abuses of arbitrary discharge.[9]

---

[6] See generally Blades, Employment at Will vs. Individual Freedom: On Limiting the Abusive Exercise of Employer Power, 67 Colum. L. Rev. 1404 (1967).

[7] See *American Steel Foundries v. Tri-City Central Trades Council*, 257 U.S. 184, 209, 42 S. Ct. 72, 78 (1921). "A single employee was helpless in dealing with an employer. He was dependent ordinarily on his daily wage for the maintenance of himself and family. If the employer refused to pay him the wages that he thought fair, he was nevertheless unable to leave the employ and to resist arbitrary and unfair treatment. Union was essential to give laborers opportunity to deal on equality with their employer."

[8] E.g., The Automobile Dealer Franchise Act of 1956, 15 U.S.C. §§ 1221-25 (1970).

[9] See Act of August 27, 1963, P.L. 1257, §§ 1-31, 71 P.S. §§ 741.3 to .1005 (Supp. 1973), amending Act of August 5, 1941, P.L. 752.

The Civil Service Act provides that "[n]o regular employe in the classified service shall be removed except for just cause." 71 P.S. § 741.807 (Supp. 1973). A regular employee is one "who has been appointed to a position in the classified service in accordance with this act after completing his probationary period." Id. § 741.3(k). Classified service is defined to include all positions (other than certain managerial-type employees and unskilled laborers, id. § 741.3(c)) in enumerated departments of the state. Id. § 741.3(d)(1)-(15).

Yet, under the majority's view, unorganized employees remain unprotected. Here, Geary's discharge is directly contrary to the societal interest in preventing injury due to defectively-manufactured products. See Restatement (Second) of Torts § 402A (1965). Moreover, Geary was dismissed for simply fulfilling his duty to notify his superiors of a potentially dangerous situation. See Restatement (Second) of Agency § 381 (1958). The majority, however, refuses to recognize a cause of action in these particular circumstances. In my view, this Court should take this first step and protect Geary and unorganized employees from arbitrary and retaliatory discharges.

"The judiciary has not been reluctant to expand the meaning of constitutional provisions in order to protect the individual from governmental oppression. It is something of a paradox that the courts have so far displayed no similar bent for invention and improvisation when it comes to protecting individuals, particularly in their highly vulnerable status as employees, from the private establishments upon which they are becoming increasingly dependent. Instead, there has been a blind acceptance of the employer's absolute right of discharge. This outmoded doctrine has been supported by technical principles of contract law." Blades, Employment at Will vs. Individual Freedom: On Limiting the Abusive Exercise of Employer Power, 67 Colum. L. Rev. 1404, 1435 (1967).

Courts are duty-bound to fashion remedies for the changing circumstances of economic and social reality. And it is far too late in the day for this Court to indulge itself by fictionalizing that the doctrine of free-

---

The Civil Service Act further requires that every state employee covered by the Act be given notice of "any personnel action taken with respect to him," id. § 741.950, and that he be provided an opportunity to appeal to and appear publicly before the Civil Service Commission. Id. § 741.951.

dom of contract justifies insulation of an employer's arbitrary and abusive exercise of his power of discharge.

The majority concedes, as it must, that tort law is uniquely suited for judicial action. Further, it cannot be denied that prevention of injuries is a substantial, clear, and compelling objective of our society. See Restatement (Second) of Torts § 402A (1965); cf. Restatement (Second) of Agency § 381 (1958).

This Court should, in my view, fulfill its societal role and its responsibility to the public interest by recognizing a cause of action for wrongful discharge where the dismissal offends public policy.[10] George B. Geary has presented just such a case.

The orders of the Superior Court and the Court of Common Pleas of Allegheny County should, in my judgment, be reversed.

---

[10] The Supreme Court of New Hampshire recently limited employers' arbitrary dismissal power by recognizing a contractual cause of action for a malicious breach of a contract of employment at will. *Monge v. Beebe Rubber Co.*, 316 A.2d 549 (N.H. 1974), announced after the filing of this case, involved a suit by Olga Monge against her employer for breach of an at-will employment contract. Monge claimed her discharge was caused by the harassment of her foreman, whose hostility resulted from her refusal to go out with him. The jury found in her favor and the Supreme Court of New Hampshire affirmed on liability but remanded on damages. In doing so that court reasoned: "In all employment contracts, whether at will or for a definite term, the employer's interest in running his business as he sees fit must be balanced against the interest of the employee in maintaining his employment, and the public's interest in maintaining a proper balance between the two." 316 A.2d at 551. The holding of the New Hampshire Supreme Court was explicit. "We hold that a termination by the employer of a contract of employment at will which is motivated by bad faith or malice or based on retaliation is not the best interest of the economic system or the public good and constitutes a breach of the employment contract."