**Narcy R. MALEY**

v.

**JOHN HANCOCK MUTUAL LIFE INSURANCE COMPANY.**

Civ. A. No. 82–863.

United States District Court,
E.D. Pennsylvania.

April 26, 1985.

John P. Foster, Philadelphia, Pa., for plaintiff.

Thomas A. Shovlin, Philadelphia, Pa., for defendant.

## MEMORANDUM AND ORDER

TROUTMAN, Senior District Judge.

In July, 1946, plaintiff, Narcy R. Maley, began working as an insurance agent for defendant John Hancock Mutual Life Insurance Company. Mr. Maley began working in a managerial capacity in December, 1947. In March, 1970, he was appointed District Manager of Hancock's Allentown District Office, a position he held until his retirement in April, 1980.

John Hancock is comprised of approximately 270 districts throughout the nation. A number of district offices are grouped together to form a region. The Allentown district office was one of eighteen (18) district offices which formed the defendant's East Central Region. A District office is run by a district manager whose responsibilities include: recruiting, training and supervising a sales and clerical staff; minimizing agent turnover; attaining sales objectives set by the home office; and maintaining intra-office proficiency and morale. Aside from the district manager the staff of a district office is comprised of several staff managers, each of whom supervises a team of agents, the agents themselves, an office supervisor and clerical workers.

All district managers within a given region report to the field vice president responsible for that region. The field vice president reports to a second vice president who, in turn, reports to the senior vice president of the District Agency Department. From 1974 through the remainder

of his employment with defendant, plaintiff's field vice president was Ronald Bair (Bair), his second vice president was Leroy Branton (Branton), and the senior vice president of the District Agency Department was A. William Rhodes (Rhodes).

John Hancock has a practice of ranking its district offices nationwide from most productive to least productive. The Allentown office maintained a high national ranking at all times. Plaintiff won several company citations between the years 1970 and 1977 with a V.P. Trophy for outstanding achievement in 1977. On the whole, performance was good under plaintiff's control until the Spring of 1978. However, in 1974 Allentown's performance within the East Central Region began a gradual decline. In 1974 Allentown ranked fifth within the East Central Region in the category of "ordinary issue"[1] (Ex.D. 19). Allentown's ranking within the region had dropped to thirteenth in 1978 and had missed the production objective set by the home office by more than $1.2 million Ex.D. 19). By 1979 Allentown ranked last in the region.

Problems began to develop at Allentown in April, 1978, with the inception of a militant union movement in the office, which diverted the staff's attention and ultimately substantially reduced the volume of life insurance issued. Plaintiff stated during trial that "... a very bad and demoralizing atmosphere" pervaded the office as a result of the union movement and office performance in the summer of 1978 was disappointing.

Allentown's problems worsened through 1979. Plaintiff testified that his clerical staff had formed cliques which would not cooperate with one another and that a negative attitude permeated the office staff. Plaintiff felt the office problems were attributable to the activities of at least one of his top producing agents and the inability of his office supervisor to control the clerical staff.

In October, 1979, due to his health, plaintiff requested assistance from Branton. Branton conferred with Rhodes and decided that a meeting should be arranged with the plaintiff. Both Branton and Rhodes were of the opinion that plaintiff's performance was unsatisfactory, and some type of action was required.

A meeting took place between plaintiff, Branton and Bair in Allentown on November 7, 1979. Plaintiff was informed of Hancock's dissatisfaction and concern regarding the decline in sales efforts and deepening morale problems in Allentown. Branton expressed concern that the interpersonal conflicts within the office would magnify the production problems in the future. Branton asked for plaintiff's suggestions to improve performance in Allentown. Plaintiff suggested the removal of his top producing agent and his office supervisor. Branton declined the suggestions because in his opinion they were unsubstantiated and neither action would improve conditions at Allentown. Plaintiff's superiors felt the source of the problem rested with the plaintiff in that he had lost credibility and the ability to deal with the people in his office.

Several options were presented to the plaintiff during the November 7, 1979, meeting. Plaintiff was offered the position of District Manager of the Easton or Norristown offices. Plaintiff was also offered the position of staff manager in Allentown or the opportunity to go into personal production as an agent. The availability of early retirement was also discussed.

Plaintiff rejected the options for continued employment with the defendant due to his poor state of health. Plaintiff stated during the meeting that he had suffered a heart attack in the early 1970's. After informing his superiors of his health problem, plaintiff inquired of Branton whether he would qualify for disability benefits.[2]

---

**1.** Ordinary issue is defendant's term for volume of life insurance issued in terms of dollar amounts. Ninety percent of Allentown's business was comprised of "ordinary issue".

**2.** Defendant has a disability program known as Salary Continuation Benefits which it offers to district managers. The program provides three months at full pay and twenty-seven (27)

Branton responded by asking if plaintiff's physician would sign the standard disability claim form known as Form 12–G. Plaintiff stated that his doctor would sign the form. Branton relied upon plaintiff's affirmative response and the production of a supporting Form 12–G when he stated to plaintiff that he would qualify for benefits. Branton testified at trial that it had never occurred to him that plaintiff could not substantiate his claim.

Plaintiff was aware after the meeting on November 7, 1979, that there was no assurance that he would receive the disability benefits discussed and so stated to his wife. (See Deposition of Narcy R. Maley at 116). On November 15, 1979, plaintiff phoned Branton to discuss his plans. During the course of the conversation plaintiff read Branton the contents of a letter directed to Rhodes. in which plaintiff stated that he planned to take his accrued vacation for 1979 and 1980. If, at the conclusion thereof, he did not feel better, he would apply for disability and then take early retirement (Ex.P. 11). Initially, Branton approved the contents of the letter; however, after some thought he realized that the plaintiff had to be more specific as to the course of action he intended to take if he did not qualify for disability benefits. Branton then telephoned plaintiff and suggested language appropriate to convey his intentions. Both Branton and Rhodes testified at trial that it was imperative that the Company be made aware of plaintiff's future plans so they could act accordingly.

Plaintiff, via the letter of November 16, 1979, conveyed his intentions to Rhodes. Plaintiff stated that after he took his accrued vacation for 1979 and 1980 he would apply for disability benefits and if, for some reason, he did not qualify he would then take early retirement. (Ex.P. 1). Whereupon, plaintiff was replaced as district manager of the Allentown office on December 1, 1979.

On November 21, 1979, Rhodes wrote plaintiff acknowledging receipt of plaintiff's letter and reiterating plaintiff's intentions. In addition, Rhodes requested that plaintiff submit evidence to substantiate his disability claim.

Plaintiff's physician submitted a Form 12–G on January 21, 1980, (Ex.P. 2). The only medical information supplied to defendant on the form was the word "Myalgias" (muscle pain) (Ex.P. 2). Defendant's Benefit Payment Services Department informed plaintiff that further medical data would be required in order to properly evaluate his application for disability. Accordingly, on February 8, 1980, plaintiff's physician submitted a second Form 12–G along with additional medical records (Ex.P. 3). The Court notes that at no point in time did the plaintiff attempt to substantiate his claim of a heart condition.

Dr. Harold S. Kost, M.D., defendant's Medical Director, evaluated plaintiff's application and concluded that the diagnosis and degree of severity did not appear to justify an award of disability benefits (Ex.D. 26). Plaintiff was so advised on March 14, 1980.

Following denial of his claim of disability, plaintiff spoke with Rhodes, who suggested that plaintiff submit additional medical information to support his claim. Plaintiff ignored Rhodes' suggestion and began receiving early retirement benefits on April 1, 1980, and has received all retirement benefits to which he is entitled under that plan.

Plaintiff filed suit against Hancock in the United States District Court for the Eastern District of Pennsylvania on or about February 25, 1982, asserting several claims. First, plaintiff contends that Hancock, through an authorized representative, fraudulently induced plaintiff to relinquish his position as District Manager by promising him disability benefits, asserting that his decision to leave active employment with Hancock was based upon such prom-

months at ⅔ pay so long as the claimant is disabled and can substantiate his continuing

disability with supplemental medical data.

ise. Secondly, when plaintiff was denied disability benefits, he contends the defendant refused to let him resume active employment. Plaintiff claims that defendant's action constituted a wrongful discharge and seeks damages resulting from defendant's fraudulent conduct. The Court will address plaintiff's claims seriatim.

## FRAUD

When a claim of fraud is asserted by a party that party has the burden of proving by clear and convincing evidence the facts upon which the claim is based. *Laughlin v. McConnell*, 201 Pa.Super. 180, 191 A.2d 921 (1963); *O'Callaghan v. Weitzman*, 291 Pa.Super. 471, 436 A.2d 212 (1981). The evidence must be such as to enable the finder of fact to conclude without hesitation that the facts alleged are true. *O'Callaghan, supra.* Proof of several elements is necessary in a claim for fraud. Plaintiff must prove by clear and convincing evidence (1) a misrepresentation, (2) a fraudulent utterance or non-disclosure, (3) an intention by the maker that the recipient will thereby be induced to act, (4) justifiable reliance by the recipient upon the misrepresentation and (5) resulting damage to recipient. *Neuman v. Corn Exchange National Bank and Trust Co.*, 356 Pa. 442, 51 A.2d 759 (1947); *Marion Bank v. International Harvester Credit Corporation*, 550 F.Supp. 456 (E.D.Pa. 1982), *affirmed* 725 F.2d 668 (3d Cir.1983).

The fraudulent misrepresentations alleged by plaintiff were repeated promises by Leroy Branton that plaintiff would receive disability benefits if· he terminated active employment. Plaintiff claims that he relied on Branton's fraudulent promises, and left his position as District Manager of Allentown believing he would receive disability benefits and then take early retirement. The Court finds no such promise was ever made by defendant or any of its agents and likewise finds there was no intention by defendant to defraud plaintiff.

The evidence is clear that Branton never promised plaintiff disability benefits. To the contrary, Branton relied on plaintiff's representation that he had suffered a heart attack and was in poor health, when he stated that if his treating physician would sign Form 12–G, plaintiff would qualify for disability benefits. Branton stated that he believed that someone who suffered a heart attack would qualify for disability. It is equally clear that plaintiff did not rely upon representations made regarding disability benefits in reaching his decision to cease active employment. The Court concludes first that plaintiff was not certain he would qualify for disability benefits after the November meeting and so stated to his wife at that time. (Mr. Maley's Deposition at 116). Second, plaintiff was aware that Branton was not a doctor, or a member of either the Benefit Payment Services or Medical Departments, the departments to which all claims for disability are· routinely sent. Third, plaintiff not only acted voluntarily, but in accordance with his intentions as expressed in the letter to Rhodes dated November 16, 1979. Finally, plaintiff failed to follow up his disability claim with supplemental medical data as suggested by Rhodes after the initial denial of benefits in March, 1980. The Court concludes plaintiff has not carried his burden of proving that the defendant acted with the specific intent to fraudulently induce plaintiff to cease active employment with John Hancock and, therefore, finds in favor of the defendant on plaintiff's claim of fraud.

In light of the foregoing, the Court concludes as a matter of law that plaintiff is not entitled to damages on his claim for fraud.

## WRONGFUL DISCHARGE

Having found in favor of the defendant on plaintiff's claim of fraud, the Court will now address plaintiff's contention that John Hancock wrongfully discharged him. Plaintiff claims that defendant is liable for wrongful discharge because it fraudulently induced plaintiff to submit a letter dictated by Branton, expressing an intent to apply for disability and take early retirement thereby terminating active employment with the Company. Plaintiff claims to

have relied upon promises made by defendant's agents that he would receive disability if he left active employment. After denial of his application for disability, plaintiff alleges the Company refused to allow him to resume active employment and forced him to retire, thereby terminating his employment. Plaintiff claims this conduct amounted to a wrongful discharge.

Presently in Pennsylvania an employee at will has no cause of action against an employer for wrongful discharge unless he proves the employer acted with the specific intent to cause harm or the act was contrary to public policy. *O'Neill v. A.R.A. Services, Inc.*, 457 F.Supp. 182 (1978); *Geary v. U.S. Steel Corp.*, 456 Pa. 171, 319 A.2d 174 (1974). In the present case the plaintiff acknowledged at trial that he was employed under a written contract (Ex.D. 29) which did not set forth any specific term of employment. Under the law of Pennsylvania such an employee is deemed to be an employee at will. *Karr v. Township of Lower Merion*, 582 F.Supp. 410 (E.D.Pa.1983); *Bruffett v. Warner Communications, Inc.*, 692 F.2d 910 (3d Cir.1982).

The Court concludes, based on the evidence produced at trial, that plaintiff was in fact never discharged from employment with the defendant. To the contrary, defendant acquiesced to plaintiff's original intentions, as stated in his letter to Rhodes, dated November, 1979, to take early retirement if disability was not approved. Even if the Court were to conclude that defendant's action taken as a whole constituted a discharge of plaintiff, plaintiff would have to prove that defendant acted in bad faith and against public policy in order to prevail. *O'Neill, supra.; Geary, supra.*

Plaintiff claims the methods used by defendant, promising disability and dictating a letter, later used to keep plaintiff from active employment, were against public policy. However, as stated above, the Court finds that neither the defendant nor any representative thereof made promises to plaintiff or acted with the specific intent to cause plaintiff harm.

In addition, testimony was presented which showed that defendant was dissatisfied with plaintiff's performance and, therefore, had sufficient grounds to discharge him. Plaintiff stated at trial that he was aware that he could be discharged if his performance was unsatisfactory. Pennsylvania courts adhere to the subjective standard in deciding whether an employee had performed to the satisfaction of his employer. *Kramer v. Philadelphia Leather Goods Corp.*, 364 Pa. 531, 73 A.2d 385 (1950). Therefore, defendant would have had sufficient grounds to discharge plaintiff if it so desired.

The Court does not accept plaintiff's argument that the decision in *Paul v. Lankenau Hospital*, 114 Montg.Co.L.R. 3 (1984), is similar to the present case and should be followed. In that case, plaintiff, acting on representations of his supervisor, removed equipment from the hospital and was terminated for doing so. The court held that the hospital was equitably estopped from arguing that the plaintiff was an employee at will, and, therefore, had no right to continued employment. In the present situation this Court has found that the representations made by defendant were made in reliance on plaintiff's statements concerning his health. Therefore, defendant's statements were not in bad faith and *Paul v. Lankenau, supra,* is inapplicable.

Further, the mere fact that termination is likely to cause some financial harm to plaintiff does not give rise to the required specific intent to support a cause of action for wrongful discharge. *Keddie v. Pa. State University*, 412 F.Supp. 1264 (M.D.Pa.1976).

The Court concludes that plaintiff did not prove (1) that he was wrongfully discharged or (2) that he had a right to continued employment. Therefore, he is not entitled to compensatory damages in the nature of lost wages. In light of the foregoing, the Court denies defendant's motion for involuntary dismissal.

This Court has jurisdiction. It is not questioned by either party. The above shall constitute the findings of fact and conclusions of law as found and entered by the Court. An appropriate order shall be entered.

## ORDER

AND NOW, this 26th day of April, 1985, IT IS ORDERED that judgment is entered in favor of the defendant and against the plaintiff.