## Runski v. Nu-Car Carrier Inc.

*Timothy P. O'Reilly,* for plaintiffs.
*William H. Hauser,* for defendant.

FINKELHOR, *J.,* March 30, 1987—The above captioned matter involves a complaint in equity alleging a violation of the Pennsylvania Human Relations Act, 43 P.S. §955, for defendant's alleged failure to hire plaintiffs based upon nonjob related handicap or disability.

Plaintiffs have also alleged that defendant's refusal to hire them was based on their prior history of worker's compensation claims, which, they allege, constitutes an unlawful discriminatory practice under the Pennsylvania Human Relations Act.

The issue is whether an employer may consider a prospective employee's worker's compensation history in making its hiring decision.

## BACKGROUND

*Findings of Fact*

Plaintiffs Runski and McCloskey were employed by Automobile Transport Inc. as yardmen at its Carnegie Terminal. Runski had been employed by ATI for seven and one-half years, McCloskey for 11 years. ATI, as the name implies, was engaged in the

business of transporting automobiles from the manufacturers to the various dealers. At the time of this particular case, ATI was under contract with Ford Motor Company. New cars would be delivered to the ATI terminal by truck or rail and they would be trucked or driven to Pittsburgh area dealers. The yardmen were responsible for checking and unloading the cars and then driving them out to the dealerships. The job required climbing on rail cars and trucks and bending and stooping to disengage the cars from their moorings. The work was performed outside in all kinds of weather.

In April 1979, the employees learned that the operation was being taken over by Nu-Car Carrier Inc.[1]

At this time, ATI employed 46 full-time truck drivers, 10 yardmen and nine mechanics at the Pittsburgh yard. These employees were represented by Teamsters Local 249.

Runski and McCloskey made application to Nu-Car for employment and were separately interviewed by Mr. Walls, the Safety and Personnel Manager of Nu-Car, late in April 1979. Mr. Walls asked both men about their worker's compensation history as reported in the application form. The only other information that was solicited at these interviews concerned uniform size. The applicants were also photographed apparently for the purpose of preparing an identification card. Mr. Walls' notes of the interviews, which were introduced into evidence, list length of service with ATI, driver's license data, date of last physical examination, name of physician, uniform sizes and worker's compensation history.

---

1. There is no dispute that Nu-Car is not a successor corporation under any obligation to hire former ATI employees.

McCloskey related his compensation history, which consisted of an eye injury which occurred in 1972. McCloskey was injured when a piece of steel from a rail car became lodged in the iris of his eye. A cataract formed as a result, which had to be removed by laser surgery. He was unable to work for approximately five months. Two additional surgical procedures were performed, which resulted in a total of three additional weeks of work lost. McCloskey now wears a soft contact lens which gives him 20/40 vision in the impaired eye.

McCloskey was paid an amount provided by worker's compensation for the partial loss of vision in the injured eye. He also has a suit pending against Ford Motor Company stemming from this same injury.

However, McCloskey's partial loss of vision does not appear to interfere with his ability to perform the duties required of him as a yardman. He still holds a valid Pennsylvania driver's license and passed an ICC physical examination certifying that no physical condition prevented him from meeting the requirements of the job.

In addition to the eye injury, McCloskey suffered an injury to his knee in 1977. He missed five weeks of work but recovered normally and appears to suffer no residual effect.

Mr. Runski also listed two compensation claims on his application. He missed three weeks of work in 1976 or 1977 due to an ankle injury. He also suffered an injury to his neck in 1977-78 when a rail car he was unloading lost its brakes and jerked suddenly. He again missed three weeks of work due to his back/neck injury.

Runski's neck was re-injured on April 9, 1979, when a van in which he was a passenger was rear-ended. He was "off work" with this injury when the

takeover by Nu-Car was announced. Runski returned to work on April 16, a day earlier than scheduled. This injury was covered under a "no-fault" policy.

Representatives of Nu-Car admitted that they used worker's compensation data as a guide to attendance, work habits and ability to work outdoors, but that none of the applicants were rejected on that basis. Of the 14 ATI yardmen who applied for positions with Nu-Car, eight were hired. One of those hired had three claims, three had one claim and four had no claims. Of the six not hired by defendant, one had four claims, two had two claims (McCloskey and Runski), two had one claim and one had no claims.

Mr. Fawcett, who was then Nu-Car's vice president in charge of industrial relations, was the individual who made the final decision on who would be hired. In reaching his decision, he stated that he relied on the application data submitted to him by Mr. Walls and from ATI management personnel. Mr. Fawcett further stated that he based his decision mainly on productivity and that he had resolved to "break up" the unproductive group at the Pittsburgh terminal. To further this aim, Nu-Car hired four yardmen from ATI's pool of casual employees to replace those yardmen who were not hired. The move was apparently unsuccessful as Ford Motor Company subsequently awarded the unloading contract to a competitor, which resulted in the permanent layoff of all but one of the yardmen.

By way of further defense, Nu-Car indicated that it had retained a number of employees who exhibited, relatively speaking, more serious physical impairment than either of the plaintiffs. One of the yardmen who was retained had a history of back problems and was primarily used as a van driver. Of

the ATI drivers retained by Nu-Car, one had a club foot and another suffered from cancer.

Plaintiffs' last day of work was May 25, 1979, and Nu-Car took over the operation of the terminal the following day. They had been informed that they would not be hired two weeks earlier when their names did not appear on the posted list of persons hired. Shortly thereafter, their positions were filled by new employees.

In an attempt to regain their jobs, plaintiffs filed a complaint with the National Labor Relations Board alleging violation of section 8 of that act. The NLRB, on January 29, 1980, ruled that the employer did not hire plaintiffs because of their history of on-the-job injuries and not in retaliation for filing compensation claims. It distinguished the case of *Krispy Kreme Donut Corp.*, 245 NLRB No. 135 (1979), which held that filing worker's compensation claims constituted protected concerted activity.

Plaintiffs also complained to the Pennsylvania Human Relations Commission, which on January 29, 1980, ruled that the facts of the case did not establish probable cause to credit their allegations of unlawful discrimination. The PHRC denied reconsideration of the case on April 30, 1980. Following denial by the PHRC, plaintiffs appealed to this court.

## Position of the Parties

Plaintiffs' chief contention is that Nu-Car refused to hire them based on their record of worker's compensation claims, or due to their nonjob related handicap or disability which arose as a result of injuries sustained while in the employ of ATI. In effect, plaintiffs complain that they are being penalized for doing what ATI required them to do, i.e., to report all injuries to their supervisor.

Defendants' position is that it may legitimately examine a prospective employee's worker's compensation history in order to determine that individual's attendance record, work habits and whether he or she suffers from a job-related handicap or disability. It further contends that neither of the plaintiffs were excluded on the basis of their worker's compensation history, and that neither suffers from any handicap or disability within the meaning of the act.

## Discussion and Conclusions of Law

Although not, strictly speaking, a wrongful discharge case, since it is based on a refusal to hire, the facts of this case closely parallel the emerging law of wrongful discharge.

In the past, the doctrine of employment "at will" has formed the basis for employment relations in the nonunionized sector. Thus, in the absence of an agreement to the contrary, the employment relationship could be terminated at the whim of either party for any reason or no reason at all. *Trainer v. Laird*, 320 Pa. 414, 183 Atl. 40 (1936). As modern society has progressed and we became a "nation of employees," our courts have indicated that the employer's interest in running his business as he saw fit is not absolute; that it exists in the context of, and must sometimes yield to other interests, including the interest of the employee and the interest of the public against arbitrary behavior. *Yaindl v. Ingersoll-Rand Co. Standard Pump-Aldrich Division*, 281 Pa. Super. 560, 422 A.2d 611 (1980). The Pennsylvania Supreme Court has acknowledged an exception to the at-will employment doctrine where "a clear mandate of public policy is violated." *Geary v. United States Steel Corp.*, 456 Pa. 171, 319 A.2d 174 (1974).

The civil rights movement has encouraged the notion that an employer's right to hire whom he pleases may be circumscribed by the public policy of promoting equal employment opportunity for all. In furtherance of this goal, Pennsylvania has deemed it an unlawful discriminatory practice to refuse to hire the best qualified employee and may not discriminate on the basis of handicap or disability.

One of the public policy exceptions which has been carved out over the years arises when an employee is discharged in retaliation for doing or refusing to do some proscribed conduct. See e.g., *Reuther v. Fowler & Williams,* 255 Pa. Super. 28, 386 A.2d 119 (1978) (employee discharged for accepting jury service). In other states, the retaliating discharge exception has been extended to instances where an employee is discharged for filing a claim under worker's compensation for injuries received in the course of employment. See e.g., *Sventko v. Kroger Co.,* 69 Mich.App. 644, 245 N.W.2d 151 (1976); *Kelsay v. Motorola Inc.* 74 Ill.2d 172, 384 N.E.2d 353 (1978); see also, Annot. 63 A.L.R.3d 979.

Some states have adopted statutes providing for civil and criminal penalties against employers who discharge employees for exercising their right to claim worker's compensation benefits. See e.g., Mo.Am.Stat. Sec. 287.780. Moreover, the National Labor Relations Board has held that the filing of a claim under the applicable worker's compensation law is protected concerted activity, for which the employee should not be discharged. *Krispy Kreme Donut Corp.,* supra.

The protections afforded presently employed persons who file worker's compensation claims and the strong policy reason therefore have not, as yet, been

held to apply to mere applicants for employment and no cases have been discovered in which it was found objectionable for an employer to inquire into or discriminate on the basis of an applicant's worker's compensation history.

Because the employee is generally required to report all injuries, and it is in his interest to do so, such information regarding compensation may provide important information on employee work habits. It is also presumably subject to verification by the employer.

Accordingly, it is the conclusion of this court that Nu-Car did not unfairly discriminate against plaintiffs by inquiring into their worker's compensation history. The court's conclusion might have been different had it appeared that plaintiffs had actually been discriminated against based on the fact that they had previously filed worker's compensation claims. In that case, the public policy against retaliatory discharge of employees might well apply with equal force to a "retaliatory" refusal to hire. The court concludes, however, that, in this case, the plaintiffs' history of filing worker's compensation claims was not the reason for Nu-Car's refusal to rehire them.

The court next considers plaintiffs' contention that they were not hired because of handicap or disability. On this issue, the court concludes as a matter of law that plaintiff Runski suffered no handicap or disability upon which any sort of discrimination could be based.

A closer question is presented in the case of Mr. McCloskey, who suffered a partial loss of vision in one eye. Although he testified that the artificial lens gave him 20/40 vision in the impaired eye, he also testified that he was not able to wear the lens all the time, and that without it his vision in that eye was

substantially impaired.

Section 5 of the Pennsylvania Human Relations Act, 43 P.S. § 955 (Purdon's Supp., 1985), provides, in pertinent part, as follows:

"It shall be an unlawful discriminatory practice, unless based upon a bona fide occupational qualification . . .

"(a) For any employer because of . . . non-job related handicap or disability of any individual to refuse to hire or employ, or to bar or to discharge from employment such individual, or to otherwise discriminate against such individual with respect to compensation, hire, tenure, terms, conditions or privileges of employment if the individual is the best able and most competent to perform the services required."

This section closely parallels Federal Equal Employment legislation appearing at 42 U.S.C. §2000e-2 (1976).

The Pennsylvania Human Relations Commission's definition of "handicapped person" is found at 16 Pa.Code. Sec. 44.4 and is defined as one who "has a physical or mental impairment which substantially limits one or more major life activities." Recently our Commonwealth Court has applied this definition to an individual lacking sight in one eye and concluded that such an individual is a "handicapped person." "Obviously, lack of sight in one eye will impose a severe barrier upon a major life function — eyesight." *National R.R. Passenger Corp. (AMTRAK) v. Com. Pa. Human Relations Commission,* 70 Pa. Commw. 62, 452 A.2d 301 (1982). On this basis, the court concludes that plaintiff McCloskey is a "handicapped person" within the meaning of the PHRA.

The PHRA defines the term "nonjob related handicap or disability" as follows:

". . . any handicap or disability which does not substantially interfere with the ability to perform the essential functions of the employment which a handicapped person applies for, is engaged in or has been engaged in. Uninsurability or increased cost of insurance under a group or employee insurance plan does not render a handicap or disability job related." 42 P.S. §954 (p).

Based on the fact that McCloskey was apparently able to function as a yardman for ATI from 1972 until 1979, the court concludes that McCloskey's handicap was nonjob related.

Thus, it appears that McCloskey has made out a prima facie case for discrimination under section 955 of the PHRA, which requires proof that (1) complainant was a member of a protected class, (2) that he applied for a job for which he was qualified, (3) that his application was refused, and (4) that the employer continued to seek other applicants with equal qualifications. *National RR Passenger Corp.,* supra; *General Electric Corp. v. Pennsylvania Human Relations Commission,* 469 Pa. 292, 365 A.2d 649 (1976).

Once the prima facie case is established, the burden shifts to the employer to establish a legitimate, nondiscriminatory reason for the denial of employment. *National RR Passenger Corp.,* supra.

It appears to the court that the refusal to hire McCloskey was not grounded upon legitimate business concerns but rather on the basis of handicap or disability. See *General Electric Corp. v. Com. Human Relations Comm.,* supra.

For the reasons stated herein, the relief requested by plaintiffs in the above captioned case must be denied as to Runski and granted as to McCloskey.

A decree nisi is attached hereto.

## DECREE NISI

And now, this March 30, 1987, after hearing in the above matter and consideration of the record and briefs and arguments of counsel, it is hereby ordered, adjudged and decreed as follows:

(1) Plaintiffs' history of filing worker's compensation claims was not the basis for Nu-Car's refusal to hire them.

(2) Plaintiff Runski suffered no handicap or disability upon which any sort of discrimination could be based.

(3) Plaintiff McCloskey is a "handicapped person" within the meaning of the PHRA and the refusal to hire was not grounded on legitimate business concerns.

Therefore, the relief requested by plaintiff McCloskey in this matter is granted and denied as to plaintiff Runski.

Thirty days from the date of this decree, this shall become the final decree of the chancellor.