2024 PA Super 274

| PATRICK DEVORE | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| | : | |
| METRO AVIATION, INC. | : | |
| | : | |
| Appellant | : | No. 943 WDA 2022 |

Appeal from the Judgment Entered July 19, 2022
In the Court of Common Pleas of Allegheny County Civil Division at
No(s):  GD 18-012018

| PATRICK DEVORE | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| Appellant | : | |
| | : | |
| | : | |
| | : | |
| v. | : | |
| | : | |
| | : | |
| METRO AVIATION, INC. | : | No. 944 WDA 2022 |

Appeal from the Judgment Entered July 19, 2022
In the Court of Common Pleas of Allegheny County Civil Division at
No(s):  GD 18-012018

BEFORE:  BOWES, J., OLSON, J., and KING, J.

OPINION BY OLSON, J.:                    **FILED:  November 18, 2024**

At the appeal docketed at number 943 WDA 2022 in this consolidated matter, Metro Aviation, Inc. (Metro) challenges an adverse judgment entered on July 19, 2022 in the Civil Division of the Court of Common Pleas of Allegheny County.  Among other things, Metro asserts that it is entitled to a judgment notwithstanding the verdict (JNOV) on grounds that the trial court wrongly permitted Metro's former employee, Patrick DeVore (DeVore), to pursue a common law wrongful discharge claim under the public policy

exception to Pennsylvania's at will employment doctrine. At the cross-appeal docketed at 944 WDA 2022, Devore also challenges the July 19, 2022 judgment, but he claims the trial court erred in denying him the opportunity to seek punitive damages against Metro. After careful consideration, we conclude the trial court erred in allowing DeVore to invoke the public policy exception and pursue a wrongful termination claim under the facts of this case. Accordingly, we are constrained to vacate the judgment entered in the trial court and remand this matter for entry of a JNOV in favor of Metro.

The trial court summarized the factual background of this case as follows.

> This case arises following [Metro's] decision to suspend, and ultimately terminate, [DeVore].
>
> [DeVore was] a seasoned pilot with various high ratings and certifications.[1] [He] began working at Metro as a pilot in April 2007, up until his suspension and ultimately, his termination, in October 2017. Metro is an air medical operator with various bases specializing in providing emergency transportation services, including transporting Allegheny Health Network ("AHN") patients and accompanying medical personnel by LifeFlight helicopters, piloted by Metro employees. [DeVore] began his career with Metro as a line pilot in Cranberry, Pennsylvania, before becoming a lead pilot in Chicago, Illinois.[2] [DeVore] then worked as a line

_____

[1] [DeVore] has more than 35 years of experience and holds Certified Flight Instructor and Certified Flights Instructor Instrument certifications issued by the Federal Aviation Association ("FAA"), a single engine airplane commercial rating, and an Air Transport Pilot rating in multi-engine aircraft and helicopters.

[2] Lead pilots earn $3,000.00 more than line pilots at Metro.

pilot in Rostraver, Pennsylvania, and finally as a line pilot in Canonsburg, Pennsylvania ("Base").[3]

In 2017, Metro began using a smaller aircraft ("EC-135") for AHN transport from the Base.[4] Due to the new-found lack of space, AHN medical personnel began requesting reconfigurations to allow for better in-flight access to patients. Sometime before September 2017, [DeVore] discussed the nurses' requests with supervisor David Taggart (Taggart), Metro's then-Aviation Site Manager, who responded to [DeVore] that reconfiguring the EC-135 was illegal.

After nurse complaints persisted, two AHN nurses (Candice Myrgo and Robert Fareri) visited the Base to explore possible reconfigurations of the EC-135 during [DeVore's] shift on September 20, 2017.[5] [DeVore] attempted to telephone Chad Slovick (Slovick), a Metro mechanic, to inquire about the safety of the reconfiguration. However, [DeVore's] call was transferred to Metro's headquarters where he spoke to Mark Breton (Breton), Metro's Head Director of Maintenance. During the conversation, [Breton] confirmed that the reconfiguration was safe so long as [it was] done in accordance with any flight manual and/or supplements. The EC-135 remained in the reconfiguration at turnover when Lead pilot Gene Zalutsky (Zalutsky) began his shift. When [DeVore] reported back to work the next day, [Zalutsky] accused [DeVore] of failing to follow the chain of command and verify the EC-135's airworthiness before turnover,

---

[3] Metro continued to compensate Mr. DeVore as a lead pilot, despite his position as a line pilot at the Rostraver and Canonsburg bases.

[4] Before using the EC-135, Metro pilots primarily flew an EC-145, a larger aircraft, for emergency air transport.

[5] Matt Poremba (AHN Medical Director) and Chief Flight Nurse Karen Bourden knew of Nurse Myrgo's and Nurse Fareri's visit to the Base to explore possible reconfigurations. DeVore also believed Taggart had knowledge of Nurse Myrgo's and Nurse Fareri's visit to the Base for purposes of exploring possible aircraft reconfigurations.

which led [DeVore] to a brief outburst directed toward [Zalutsky] and [Slovick].[6]

On October 4, 2017, [DeVore] was suspended for three days due to [his behavior, conduct, and insubordination, together with a safety policy violation]. Shortly thereafter, Metro [directed DeVore] to make a rare trek to Metro's headquarters for failing to follow the chain of command. Finally, on October 10, 2017, Metro terminated [DeVore], asserting that he failed to complete a pre-flight checklist on October 4, 2017.

[DeVore initiated this action on September 17, 2018, upon filing a complaint against Metro. Devore's complaint alleged one count of wrongful termination in violation of Pennsylvania's public policy, as expressed in the Emergency Medical Services System (EMSS) Act, 35 Pa.C.S.A. § 8101-8158. At the conclusion of trial on March 10, 2022, the jury began deliberations and found that DeVore was terminated contrary to the policy declared in the EMSS Act. Accordingly, the jury awarded DeVore $1,142,582.00 in economic damages, as well as non-economic damages in the amounts of $500,000.000 for harm to reputation, $300,000.00 for pain and suffering, $300,000.00 for embarrassment and humiliation, and $257,418.00 for loss of the ability to enjoy the pleasures of life.]

On March 18, 2022, Metro timely [moved for post-trial relief seeking a JNOV, a new trial as to liability and damages, and a remittitur of the jury's award. DeVore also timely filed a motion for post-trial relief on March 28, 2022], seeking a new trial limited to the question of punitive damages. Both motions for post-trial relief were ultimately denied on July 15, 2022, following oral argument. On July 19, 2022, judgment was entered on the verdict, which Metro and [DeVore] appealed to [this Court] on August 16, 2022, and August 17, 2022, respectively. On the same respective dates, [the trial court directed the parties] to file concise statements of error complained of on appeal within 21 days[.][7] On September 6, 2022, both parties timely filed their [concise statements].

---

[6] Following the accusations, DeVore told Slovick that he was "sick of [his] bullsh\*\*t" before sticking his finger into Slovick's chest.

[7] Pursuant to Pa.R.A.P. 1925(b).

- 4 -

Trial Court Opinion, 12/5/22, at 1-4 (footnotes in original).

On appeal, Metro initially asserts that it is entitled to a JNOV since DeVore conceded he was an at will employee and the trial court erred in allowing him to proceed with a common law wrongful termination claim under the public policy exception to Pennsylvania's at will employment doctrine. We agree with Metro that the exception was not applicable under the facts of this case and, since we find this issue dispositive of the claims raised by both sides, we shall forgo discussion of Metro's administrative exhaustion and new trial claims, *see* Metro's Brief at 7-8 and 31-57, and we will not undertake a review of the punitive damage issues raised by DeVore in his cross-appeal. *See* DeVore's Brief at 73-74 and 78-105.

Metro claims that the trial court erred in denying its post-trial motion for a JNOV because, as a matter of law, DeVore did not identify a valid public policy exception to Pennsylvania's at will employment doctrine. Our standard and scope of review for an order that denied a request for a JNOV involve well settled legal principles.

> A motion for [JNOV] is a post-trial motion which requests the court to enter judgment in favor of the moving party. There are two bases on which the court can grant [JNOV].
>
> [One holds that] the movant is entitled to judgment as a matter of law [and the other holds that] the evidence is such that no two reasonable minds could disagree that the outcome should have been rendered in favor of the movant. With the first, the court reviews the record and concludes that even with all factual inferences decided adverse to the movant the law nonetheless

requires a verdict in his favor, whereas with the second, the court reviews the evidentiary record and concludes that the evidence was such that a verdict for the movant was beyond peradventure.

In an appeal from the trial court's decision to deny [a motion for JNOV, a court] must consider the evidence, together with all favorable inferences drawn therefrom, in a light most favorable to the verdict winner. Our standard of review when considering motions for a directed verdict and judgment notwithstanding the verdict are identical. We will reverse a trial court's grant or denial of a [JNOV] only when we find an abuse of discretion or an error of law that controlled the outcome of the case. Further, the standard of review for an appellate court is the same as that for a trial court.

Concerning any questions of law, our scope of review is plenary. Concerning questions of credibility and weight accorded the evidence at trial, we will not substitute our judgment for that of the finder of fact[. A JNOV] should be entered only in a clear case. [T]he entry of a [JNOV] is a drastic remedy. A court cannot lightly ignore the findings of a duly selected jury.

*Stange v. Janssen Pharmaceuticals, Inc.*, 179 A.3d 45, 52-53 (Pa. Super. 2018) (internal citations, punctuation, and quotation marks omitted).

Metro's position is that a JNOV was proper because the limited scope of the public policy exception did not permit the trial court to review DeVore's termination as an at will employee in the undisputed circumstances presented here. In this Commonwealth, the law presumes that all employment relationships are at will, that all at will employees may be discharged for any reason or no reason, and that discharges from at will employment are not subject to review in a judicial forum. *See Scott v. Extracorporeal, Inc.*, 545 A.2d 334, 336 (Pa. Super. 1988). "[Since at will employment is the presumption in

Pennsylvania], the burden of proving that one is not employed [at will] rests squarely upon the employee." ***Rutherford v. Presbyterian-University Hosp.***, 612 A.2d 500, 503 (Pa. Super. 1992). To rebut the presumption of an at will employment relationship, an employee must establish: "(1) sufficient additional consideration; (2) an agreement for a definite duration; (3) an agreement specifying that the employee will be discharged only for just cause; or (4) an applicable recognized public policy exception." ***Robertson v. Atlantic Richfield Petroleum Products Co. (a Div. Atlantic Richfield Co.)***, 537 A.2d 814, 819 (Pa. Super. 1987). DeVore's complaint against Metro alleged a single wrongful discharge count in violation of the policies declared in the EMSS Act; hence, DeVore conceded his status as an at will employee of Metro and this appeal turns on whether the trial court, as a matter of law, properly permitted DeVore to invoke the public policy exception as grounds to overcome the presumption of at will employment.

In rejecting Metro's post-trial motion for a JNOV, the trial court appears to have assumed that the EMSS Act contained a sufficiently clear and robust declaration of public policy that permitted DeVore to overcome the presumption of at will employment and created for him a cognizable, common law claim for wrongful termination. As such, the court did not consider, as a separate matter, whether the statements

contained within the EMSS Act established a viable employment claim for DeVore. Instead, the court recalled one of the policy statements found in the Act and concluded that, since the evidence (viewed in the light most favorable to DeVore) was sufficient to demonstrate that Metro discharged DeVore in violation of the cited policy language, the record did not support Metro's request for a JNOV. Specifically, the trial court stated:

> Here, the Pennsylvania General Assembly has articulated by statute, amongst other things, "[i]t serves the public interest if the emergency medical services system is able to quickly adapt and evolve to meet the needs of the residents of this Commonwealth for emergency and urgent care and to reduce their illnesses and injury risks." 35 Pa.C.S.A. § [8102(5)]. At trial, [DeVore] introduced ample evidence that the EC-135 reconfiguration constituted an aim toward better in-flight access to patients, and thus, patient safety."[8] [DeVore] also introduced evidence regarding communications with mechanic staff to ensure that the reconfiguration was safe. The inquiry here is not whether the [trial c]ourt agrees with the jury's findings, but rather, whether there was sufficient evidence in support thereof. **See Brown v. Shirks Motor Exp.**, 143 A.2d 373, 379 (Pa. 1958) ("A judge's appraisement of the evidence is not to be based on how he would have voted had he been a member of the jury, but on the facts as they come through the sieve of the jury's deliberation."). Seeing that there was sufficient evidence introduced at trial supporting the jury's finding that Metro wrongfully terminated [DeVore] in violation of public policy established pursuant to the [EMSS] Act, and viewing such evidence in favor of [DeVore], it cannot be said that "no two reasonable minds could disagree that the outcome should have been rendered in favor of [Metro]." [**Janis v. AMP, Inc.**, 856

---

[8] The testimony of Nurse Candice Myrgo, Nurse Robert Fareri, and Chief Flight Nurse Karen Bourden supported the conclusion that the EC-135 was reconfigured for the purpose of allowing better in-flight access to patients.

> A.2d 140, 142-144 (Pa. Super. 2004)]. As such, [the trial c]ourt did not err in denying Metro's [motion for JNOV].

Trial Court Opinion, 12/5/22, at 8-10.

DeVore defends the trial court's rejection of Metro's motion for a JNOV, maintaining that he "properly pursued a claim for wrongful discharge under Pennsylvania common law" and noting that "Pennsylvania courts have long recognized a claim for wrongful discharge where a public policy is threatened or violated by the employee's discharge." DeVore's Brief at 18. Citing various statutory and regulatory provisions, DeVore insists that the EMSS Act established an obvious public safety policy, that his termination contravened and impeded the policy, and that the public policy exception allowed him to pursue a wrongful discharge claim consistent with Pennsylvania precedent. *See id*. at 20. Specifically, DeVore asserts:

> In the [EMSS] Act, the Pennsylvania [General Assembly] stated, *inter alia*, "It serves the public interest if the medical services system is able to quickly adapt and evolve to meet the needs of the residents of this Commonwealth for emergency and urgent medical care and to reduce their illness an injury risks." 35 Pa.C.S.A. § 8102(5). In addition, [DeVore] notes that 28 Pa. Code § 2017.40 details the scope of emergency medical services to be provided and the desire to safely operate equipment. A third public policy interest is enumerated by the Pennsylvania Legislature at 74 Pa.C.S.A. § 5301(d) which requires conformity with federal aviation laws. Further, 28 Pa. Code § 117 details the importance of providing lifesaving emergency services. It is clear that safety considerations in emergency helicopter transport are of paramount importance to the Commonwealth as expressed in multiple statutes by the legislature and that employees are expected to conduct themselves in conformity with those laws.
>
> The purpose behind reconfiguring the EC-135 aircraft to better store equipment and have better access to patients is in accord

with Pennsylvania's public policy to "meet the needs of the residents of this Commonwealth for emergency and urgent medical care and to reduce their illness and injury risks." 35 Pa.C.S.A. § 8102(5). Further, the reconfiguration of the EC-135 aircraft involves emergency transport which the General Assembly declared is an "integral part of the health care delivery system in this Commonwealth, and it is in the public interest that the emergency medical services system serve all persons in this Commonwealth who: (1) require medical care to address illness or injury; (ii) need transportation to a hospital or other health care facility to receive that care; and (iii) require medical assessment, monitoring, assistance, treatment or observation during transport." 35 Pa.C.S.A. § 8102(4)(emphasis supplied). The legislature's intent could not be more clear in that references to "public interest" or "public services" appear in each of the first seven (7) paragraphs of the [EMSS] Act. To suggest a public policy is not specifically enumerated belies the plain text of the statute.

***See id***. at 20-22.

To support his contention that the conduct on which his discharge was based aligned with the declarations of public policy found within the EMSS Act, DeVore points to the trial testimony of flight nurses, who explained that the purpose behind the reconfiguration "was to allow for better in-flight access to patients needing treatment." ***Id***. at 23. DeVore also notes that his "communications with Metro's headquarters followed his express desire to assist AHN [nurses in their] ability to effectively treat patients during a flight." ***Id***. at 23-24. DeVore insists that the jury agreed, and Metro did not refute, that "[t]he root of [DeVore's inquiry with Metro's headquarters was confirmation] of the safety of the reconfiguration for the purpose of adapting and evolving to meet the needs of the residents of this Commonwealth for emergency and urgent medical care and to reduce their illness and injury

risks." *Id.* at 25-26 (emphasis omitted). In view of his termination following these internal, safety-related inquiries aimed at improving patient treatment during emergency medical transport, DeVore concludes that he alleged a viable claim for wrongful discharge under the public policy exception, observing:

> The public policy expressed in the [EMSS] Act is for the safety and welfare of the residents of this Commonwealth [who seek] emergency transport services. It is imperative that those services be provided consistent with the policy advanced by the legislature. That public policy is undermined when an employer engages in conduct intended to have a chilling effect on the exercise of emergency transport personnel, and pilots in particular, of their statutory obligation to ensure patient safety even if contrary to business operations. As [DeVore] has set forth a lawful claim for wrongful discharge pursuant to established Pennsylvania public policy, judgment should be affirmed.

*Id.* at 28-29.

Metro takes a different view. It contends that the trial court wrongly denied its motion for a JNOV since DeVore was an at will employee and he failed to identify a valid public policy exception to Pennsylvania's presumptive rule. *See* Metro's Brief at 19. According to Metro, DeVore did not point to a clear public policy in the Commonwealth's constitution, statutory enactments, or judicial decisions which directly related to the facts in this case. *See id.* at 21. Also, Metro submits that Devore did not report safety concerns arising from seat configuration to any Commonwealth agency (or pursuant to any statutory mechanism) and, although he cited the EMSS Act as the basis for his claims, that provision, unlike the statutory schemes that supported narrow

exceptions to at will employment in prior Pennsylvania cases, did not create specific statutory rights or privileges that were infringed or impaired by DeVore's termination. *See id.* at 23. As such, Metro concludes that DeVore's discharge following internal communications with his employer was not retaliatory in nature, did not undermine the function of any Commonwealth agency, and neither impaired nor impeded the operation of any Pennsylvania statute. *See id.* at 29. Under these circumstances, Metro contends that it was entitled to a JNOV since DeVore failed to "meet the high burden of carving out a new public policy exception to at will employment." *See id.* For the reasons that follow, we agree with Metro that DeVore did not identify a public policy exception which exempted his common law wrongful termination claim from the preemptive sweep of Pennsylvania's at will employment doctrine.

We begin by examining the principles of the at will employment doctrine and the public policy exception to it. We then examine the EMSS Act to determine whether it establishes, either through its content and structure or by its declarations of community interest, a public policy exception to at will employment that forbids termination following employee-employer communications that pertain to interior safety reconfigurations of emergency medical transportation aircraft.

Our Supreme Court has repeatedly recognized that Pennsylvania's long held presumption of at will employment "is an extremely strong one" and that "the [public policy exception to the at will employment doctrine] should be

applied in only the narrowest of circumstances." ***McLaughlin v. Gastrointestinal Specialists, Inc.***, 750 A.2d 283, 287 (Pa. 2000) (acknowledging that Pennsylvania employers, since the turn of the twentieth century, could terminate employees for any reason absent a contract and that, prior to 1974, no Pennsylvania court had ever recognized a common law cause of action for the termination of an at will employment relationship); ***see also Weaver v. Harpster***, 975 A.2d 555, 562 (Pa. 2009) (same); ***Rothrock v. Rothrock Motor Sales, Inc.***, 883 A.2d 511, 516 (Pa. 2005) ("exceptions to at will termination should be few"); ***Henry v. Pittsburgh & Lake Erie Railroad Co.***, 21 A. 157 (Pa. 1891) ("railroad corporation, or an individual, may discharge an employe with or without cause at pleasure, unless restrained by some contract"). Pennsylvania has adopted a traditional view that recognizes only few, narrowly drawn exceptions to at will employment so as to avoid erosion of an employer's inherent right to operate its business in the manner that it chooses. ***See Rothrock***, 883 A.2d at 516.

Given the strong presumption that all noncontractual employment is at will, it is unsurprising that our Supreme Court has acted cautiously in recognizing public policy exceptions to the at will employment doctrine. That caution was on display in ***Geary v. United States Steel Corp.***, 319 A.2d 174 (Pa. 1974), the Court's first decision in which it acknowledged an exception to the at will doctrine. In ***Geary***, a former salesman employed by a steel manufacturer reported to his superiors his concerns about the safety of certain

tubular products, which the company later withdrew from the market. After his termination, the salesman filed a common law action against his employer alleging that he was wrongfully discharged in violation of public policy. The trial court sustained the steel company's preliminary objections and dismissed the salesman's amended complaint. This Court subsequently affirmed. After granting allocator, our Supreme Court affirmed, holding that the salesman had no right of action against his employer for wrongful discharge where his complaint disclosed a plausible and legitimate reason for termination, and he failed to demonstrate that his termination violated a clear mandate of public policy. The Court acknowledged, however, that it might find, in appropriate circumstances, a public policy exception to the doctrine of at will employment. *Geary*, 319 A.2d at 180. In the absence of an unmistakable mandate of public policy, however, the Court reasoned that disturbing the presumption of at will employment would unwisely interfere with "the legitimate interest of employers in hiring and retaining the best personnel available [and that t]he ever present threat of [liability] might well inhibit the making of critical judgments by employers concerning employee qualifications." *Id.* at 179. According to the Court in *Geary*, the General Assembly is the most appropriate branch of government to create public policy exceptions to the at will employment doctrine. *Id.* at 180 ("we are not persuaded that creating a new non-statutory cause of action of the sort proposed by [the salesman] is

the best way to [encourage employees to express their views on the quality of an employer's products]").

Our Supreme Court thus teaches that Pennsylvania courts must look to the General Assembly as the primary source of public policies which form exceptions to the principle of at will employment. In **Weaver**, the Court explained:

> In our judicial system, the power of the courts to declare pronouncements of public policy is sharply restricted. **Mamlin v. Genoe (City of Philadelphia Police Beneficiary Ass'n)**, [17 A.2d 407, 409 (Pa. 1941)]. Rather, it is for the legislature to formulate the public policies of the Commonwealth. The right of a court to declare what is or is not in accord with public policy exists "only when a given policy is so obviously for or against public health, safety, morals, or welfare that there is a virtual unanimity of opinion in regard to it." **Mamlin**, 17 A.2d at 409. Only in the clearest of cases may a court make public policy the basis of its decision. **Id.** To determine the public policy of the Commonwealth, we examine the precedent within Pennsylvania, looking to our own Constitution, court decisions, and statutes promulgated by our legislature. **McLaughlin**, 750 A.2d at 288; **Hall v. Amica Mutual Ins. Co.**, [648 A.2d 755 (Pa. 1994)]; **Lurie v. Republican Alliance**, [192 A.2d 367 (Pa. 1963)]; **Mamlin**, [17 A.2d at 409.]

**Weaver**, 975 A.2d at 563.

Fifteen years after the decision in **Geary**, the contours of the public policy exception became more clear in **Shick v. Shirey**, 716 A.2d 1231 (Pa. 1998), the first decision in which our Supreme Court both recognized a claim for wrongful discharge in violation of a clear mandate of public policy and held that an employee forwarded viable allegations upon which relief could be granted under that theory. In **Shick**, the employee sustained a knee injury

while at work and a notice of compensation payable was issued pursuant to the Workers' Compensation Act. *Id.* at 1232. When the employee was released by his physician to return to work, his employer informed him that his job was no longer available because he filed a workers' compensation claim. *Id.* The employee filed a claim for wrongful discharge and the trial court sustained the employer's demurrer to the complaint. Ultimately, an *en banc* panel of this Court affirmed, concluding that no precedent or statutory language existed to find that the termination of an employee who had pursued workers' compensation benefits stated a cause of action for retaliatory discharge. *Id.*

The Supreme Court in **Shick** granted allowance of appeal and determined that an employer who terminates an employee in retaliation for bringing a workers' compensation claim violates the public policy of this Commonwealth and can be liable at common law for wrongful discharge. *Id.* at 1238. Mindful of its obligation to look to legislative pronouncements as guidance when seeking to identify public policy, the Court examined the history and structure of the Workers' Compensation Act. The Court noted that the "exclusivity" of the Workers' Compensation Act was rooted in the *quid pro quo* exchange between employees who agree to forgo tort remedies and their employers who agree to no-fault payments for work injuries that result in a

loss of earning power.[9]  *Id.* at 1237.  The Court concluded that the historical balance achieved under the Workers' Compensation Act would be undermined, and the rights included within the Act impaired, if an employer could penalize an employee for filing a claim and pursuing remedies created under the Workers' Compensation Act.  *Id.*  Therefore, the Court held that a wrongful discharge claim could be pursued if an employee alleged a discharge in retaliation for filing a workers' compensation action.  *Id.* at 1238.

In **Rothrock**, our Supreme Court examined a parallel claim brought by an employee who also alleged that his employer discharged him in violation of public policies articulated in the Workers' Compensation Act.  In **Rothrock**, the employee was not himself a workers' compensation claimant but alleged that he was discharged for failing to dissuade a subordinate employee from filing a workers' compensation claim.  *Id.* at 514.  Our Supreme Court held, "as a necessary corollary to the policy established in [**Shick**, that] a Pennsylvania employer may not encourage a supervisory employee to dissuade a subordinate from seeking [workers' compensation] benefits.  If an

_____

[9] The central argument raised by the employee in **Shick** asserted that a retaliatory discharge of a worker who exercised legal rights created under the Workers' Compensation Act violated a clear mandate of public policy.  **See Shick**, 716 A.2d at 1233.  The employee reasoned that, the "refusal to recognize a cause of action for wrongful discharge under such circumstances places an employee who sustains a work-related injury in the untenable position of choosing between exercising his legal rights and seeking compensation for his injury under the Act, or forgoing his legal rights in an effort to maintain his livelihood." *Id.*

employer does so, the supervisory employee shall have a cause of action for wrongful discharge from employment." ***Rothrock***, 883 A.2d at 517.

Pennsylvania courts have consistently maintained that exceptions to at will employment should be few and narrowly construed so as to preserve an employer's inherent right to operate its business as it chooses. Nevertheless, as the foregoing cases establish, public policy exceptions to at will employment have been recognized where adverse employment actions have impaired rights or duties established by statutory or constitutional law, or where employers have retaliated against employees who attempted to enforce **specific** statutory rights created by the General Assembly. ***See Reuther v. Fowler & Williams, Inc.***, 386 A.2d 119 (Pa. Super. 1978) (employee could not be discharged for serving on a jury, where disobedience of jury summons subjected employee to fine); ***Hunter v. Port Auth. of Allegheny County***, 419 A.2d 631 (Pa. Super. 1980) (public employer could not deny a former offender employment on the basis of a prior conviction for which the offender had been pardoned, unless the conviction was reasonably related to fitness to perform the job sought); ***Highhouse v. Avery Transportation***, 660 A.2d 1374 (Pa. Super. 1995) (discharge from employment constitutes violation of public policy and supports tort claim for wrongful discharge if employer terminates employee because employee made claim for unemployment compensation); ***Raykovitz v. K Mart Corp.***, 665 A.2d 833 (Pa. Super. 1995) (same); ***Kroen v. Bedway Sec. Agency***, 633 A.2d 628 (Pa. Super. 1993)

(holding that an employee was wrongfully discharged in violation of public policy where employee refused to submit to a polygraph test and state statute barred such testing); ***Owens v. Lehigh Valley Hosp.***, 103 A.3d 859 (Pa. Cmmwlth. 2014) (employee could assert wrongful discharge in violation of public policy embodied in Workers' Compensation Act where she alleged termination in retaliation for benefits claim filed with employer rather than state board, which qualified as engagement in protected activity); ***Roman v. McGuire Mem'l***, 127 A.3d 26 (Pa. Super. 2015) (health care employee could assert common law wrongful discharge claim under public policy exception where she exercised her statutory right to refuse overtime that exceeded a regularly scheduled shift and further alleged termination in retaliation for exercising right of refusal).

Where claimants have deviated from a statutory scheme cited as the source of a public policy, or where adverse employment actions have not impaired an employee's specific statutory or constitutional rights, or where a putative public policy derives from a source other than Pennsylvania precedent or an enactment of the General Assembly, Pennsylvania courts have not hesitated in rejecting common law causes of action for wrongful discharge brought under the public policy exception. In these contexts, as the cases below emphasize, policy-based exceptions to at will employment must be considered carefully so they reflect only well-defined legislative pronouncements, not simply general statements of community interest, and

preserve the General Assembly's role as the principal source of public policies from which exceptions to at will employment are derived.

For example, in ***Clay v. Advanced Computer Applications, Inc.***, 559 A.2d 917 (Pa. 1989), a married couple filed wrongful discharge claims alleging that their at will employment had been terminated after the wife rejected sexual advances by a management level employee. The trial court dismissed the couple's claims after determining that their failure to pursue administrative remedies with the Pennsylvania Human Relations Commission (PHRC) barred them from seeking judicial recourse. After this Court reinstated the claimants' common law wrongful discharge claims, our Supreme Court reversed, finding that the principle of exhaustion of administrative remedies applied to actions brought under the Pennsylvania Human Relations Act (PHRA), 43 P.S. § 951 *et seq*. "[A]llowing a discharged employee to commence an action in the courts without first exhausting administrative remedies would be logically inconsistent with the legislature's [creation of] the PHRC to function as an efficient mechanism for handling such disputes." ***Clay***, 559 A.2d at 919. The PHRA was adopted to allocate the task of addressing unlawful employment discrimination within the Commonwealth to an administrative agency with expertise and broad remedial powers. ***Id.*** Allowing claimants to initiate remedial actions in court, and to bypass the PHRC, would frustrate the General Assembly's intent. ***Id.*** at 920. Thus, ***Clay*** held that a common law wrongful

discharge claim, predicated upon public policy, could not be maintained where administrative remedies provided by statute have not been exhausted.

In **Weaver**, a discharged employee (whose claims had been rejected by the PHRC) brought an action against her former employer alleging various forms of sex discrimination prohibited by the PHRA. The trial court sustained the employer's preliminary objections and dismissed several, but not all, claims filed by the former employee. At the conclusion of trial, the court entered judgment on the jury's verdict in favor of the employer. After the former employee appealed, this Court vacated the order that granted the employer's preliminary objections and remanded the matter for further proceedings. Our Supreme Court granted the employer's request for allowance of appeal and held that neither the PHRA nor the Equal Rights Amendment of the Pennsylvania Constitution provided a public policy exception to the at will employment doctrine for sex discrimination by an employer not covered by the PHRA.

The Court in **Weaver** acknowledged that the PHRA "establish[ed] the right to be free from sex discrimination in the workplace and provide[d] the administrative procedures by which those rights shall be vindicated." **Weaver**, 975 A.2d at 565; **see also** 43 P.S. § 953. The General Assembly, however, also exempted from the PHRA employers with less than four employees. 43 P.S. § 954. The former employer in **Weaver** had fewer than four employees. **Weaver**, 975 A.2d at 557. The **Weaver** Court concluded

that it was bound by both the broad policy declaration against employment discrimination contained in the PHRA, as well as the exemption for small employers; hence, it was not free to disregard one provision of the PHRA in order to enforce another under the guise of public policy. *Id.* at 569. As a result of the unambiguous policy determination made by the General Assembly, the Court held that it was "constrained to conclude that a common law claim for wrongful discharge, resulting from sex discrimination, will not lie against those employers" with less than four employees. *Id.* at 556–557, 569.

Finally, our Supreme Court considered a common law claim for wrongful discharge based upon policies set forth in the federal Occupational Safety and Health Act (OSHA), not the statutes of this Commonwealth, in *McLaughlin v. Gastrointestinal Specialists, Inc.*, 750 A.2d 283 (Pa. 2000). In *McLaughlin*, an employee brought a claim against her employer alleging that she was discharged for making internal complaints which asserted that workplace chemical exposures violated the maximum allowances under OSHA. The employee made no claim which alleged that her employer violated a public policy arising from a Pennsylvania statute that addressed health and safety. *See McLaughlin*, 750 A.2d at 286. Moreover, the Court observed that the employee was not the subject of retaliation for making a complaint to a Commonwealth agency, as in *Shick*. *Id.* at 288. For these reasons, the employee's discharge did not thwart the administration of a Commonwealth

agency or undermine any rights or obligations governed by a Pennsylvania statute. *Id.* In the absence of such critical components of a policy-based exception to the at will employment doctrine, the employee failed to show a violation of any Pennsylvania policy and further failed to establish how private, internal reports undermined the workings of any Commonwealth agency or any statutory mechanism within Pennsylvania.[10] *Id.* at 288–289. Having determined that no violation of a Pennsylvania policy supported the employee's claims, the Court moved on to consider whether a potential violation of a federal statute justified application of a policy-based exception to Pennsylvania's at will employment doctrine. In rejecting such a claim, the Court stated:

> [The employee] in some way must allege that some **public** policy of **this** Commonwealth is implicated, undermined, or violated because of the employer's termination of the employee. [The p]ublic policy of the Commonwealth must be just that, the policy of this Commonwealth. In cases like ***Shick*** there is no question that the public interest and policy of this Commonwealth were at stake, for if we allowed an employer to discharge an employee for filing a complaint with a Commonwealth agency such as the Workers' Compensation Appeal Board, we impact the rights of that employee and the public by undermining the very purposes of a statute of this Commonwealth.

---

[10] Citing ***Geary***, the Court in ***McLaughlin*** also rejected the position that retaliation for internal reporting of workplace grievances could support a common law wrongful discharge claim under the public policy exception. *See **McLaughlin**,* 750 A.2d at 288-289 ("[In] ***Geary***, ***supra***, [the Supreme] Court refused to accept the premise that an employer, who might have terminated an employee in retaliation for making internal reports regarding the safety of a product, threatened the public policy of this Commonwealth to such an extent that it outweighed the presumption of at will employment.").

- 23 -

*Id.* at 289 (emphasis in original).

We now review the content and structure of the EMSS Act to ascertain whether DeVore has identified a valid public policy that supports a cause of action under an exception to the at will employment doctrine. To recap, DeVore's position is that the EMSS Act establishes a public policy favoring the creation and development of an emergency medical services system that is capable of rapid adaptation and evolution to meet the needs of the residents of Pennsylvania for urgent medical care. *See* DeVore's Brief at 15-16. He asserts that the purpose behind the reconfiguration of the EC-135 aircraft was to better store equipment and improve patient access during emergency medical transport. *Id.* at 21-22. DeVore further contends that his communications to Metro's headquarters aligned with the public policies found in the EMSS Act because his intention was to assist AHN flight nurses in enhancing their ability to treat patients during emergency flights. *Id.* at 24-25. DeVore concludes that Metro violated the policies found in the EMSS Act when it terminated him for reporting, to Metro headquarters, issues surrounding the reconfiguration of the EC-135 aircraft without first communicating his concerns to immediate supervisory personnel. *Id.* at 25. DeVore explains that, despite his at will employment status, he is entitled to pursue a judicial remedy since the policies expressed in the EMSS Act are "undermined when[ever] an employer engages in conduct intended to have a chilling effect on the exercise of emergency transport personnel, and pilots in

particular, of their statutory obligation to ensure patient safety even if contrary to business operations." *Id.* at 28-29.

To support his public policy claims, DeVore relies exclusively on pronouncements found in the "declarations of policy" provision of the EMSS Act. Within that section of the EMSS Act, the legislature included several broadly framed pronouncements regarding the emergency medical services system in Pennsylvania. *See* 35 Pa.C.S.A. § 8102. DeVore has cited the following declarations as the basis for his public policy claims:

> (2) It is in the public interest to assure that there are high quality and coordinated emergency and urgent medical services readily available to the residents of this Commonwealth to prevent premature death and reduce suffering and disability which arise from severe illness and injury.
> 
> ***
> 
> (4) Transportation of both emergency and nonemergency patients is an integral part of the health care delivery system in this Commonwealth, and it is in the public interest that the emergency medical services system serve all persons in this Commonwealth who:
> 
>   (i)      require medical care to address illness or injury;
>   (ii)     need transportation to a hospital or other health care facility to receive that care; and
>   (iii)    require medical assessment, monitoring, assistance, treatment or observation during transportation.
> 
> (5) It serves the public interest if the emergency medical services system is able to quickly adapt and evolve to meet the needs of the residents of this Commonwealth for emergency and urgent medical care and to reduce their illness and injury risks.

35 Pa.C.S.A. § 8102(2), (4), and (5).

DeVore urges us to accept his contention that the foregoing provisions comprise such a sufficiently clear, robust, and fulsome public policy that they

displace Pennsylvania's traditional doctrine of at will employment. Nowhere does DeVore explain, however, how these broadly drawn statutory declarations function like the legislative provisions that have supported policy-based exceptions to at will employment in prior cases.[11] Plainly, the

_____

[11] Our own study of the EMSS Act has uncovered two provisions which have only tangential relevance to the issues we confront in this case. DeVore neither cites nor discusses either provision. Section 8129(h) of the EMSS Act directs the Department of Health to inspect an emergency service provider's vehicles and equipment "from time to time" but not less than every three years. It creates no rights pertaining to employees and it imposes no duties or obligations upon an employer. Moreover, it offers no guidance concerning the agency's role in monitoring, reviewing or approving aircraft configurations, much less discuss the agency's role in the resolution of employment disputes that might arise between employers and employees in this context. Section 8129 states in full:

### § 8129. Emergency medical services agencies

(h) Inspection.--The department or its agent shall inspect an applicant's vehicles, equipment and personnel qualifications prior to granting an EMS agency license and shall inspect an EMS agency from time to time, as deemed appropriate and necessary, but not less than once every three years.

35 Pa.C.S.A. § 8129(h).

The second provision is Section 8131 of the EMSS Act, which describes the purpose of air ambulances and sets the minimum staffing requirements for such vehicles when dispatched for the purpose of transporting patients who have encountered medical emergencies.

### § 8131. Air ambulances

(a)     Purpose.--An air ambulance is a rotorcraft staffed by a crew that provides medical assessment, treatment, monitoring, observation and transportation of patients who require EMS where time to administer definitive care is of the essence and transportation by

*(Footnote Continued Next Page)*

statements DeVore draws to our attention create no rights and regulate no conduct or behavior within the employment context. Moreover, DeVore identifies no statutory mechanism or administrative structure created under the EMSS Act to monitor or approve the design or configuration of emergency air transport vehicles. In the absence of any statutory mechanisms and administrative structures created to resolve disagreements pertaining to the issues raised in this case, we cannot be certain about legislative preferences regarding appropriate forums and the substantive principles that would apply to such disputes. Nor are we prepared to agree that an employee must prevail in litigation commenced after the termination of employment simply because he acted in a manner arguably consistent with the broad declarations found in the EMSS Act. Therefore, despite the broad pronouncements found in Section 8102, we are persuaded that nothing in the composition of the EMSS

---

air ambulance to a facility able to provide the care is faster than transportation by ground ambulance, or require EMS provided by specialized equipment or providers not available on a ground ambulance and the air ambulance can provide this faster than the patient would receive such care at a receiving facility if transported by ground ambulance.

(b) Staffing requirements.--Minimum staffing standards for an air ambulance when dispatched to provide or when providing medical assessment, treatment, monitoring, observation or transportation of a patient is one pilot and two EMS providers other than the pilot who are above the advanced EMT level, with at least one of those two EMS providers specially trained in air medical transport.

35 Pa.C.S.A. § 8131(a) and (b).

Act creates the sort of statutory rights and administrative structures that traditionally have been viewed as critical components of any finding that the General Assembly intended to upset the strong presumption of at will employment which has occupied a deeply-imbedded status in Pennsylvania jurisprudence for over a century. **See McLaughlin**, **supra**.

Much as in **McLaughlin**, this is not a case in which DeVore has averred that he made a complaint to a Commonwealth agency and was fired in retaliation. Similarly, DeVore has not made clear how his termination implicates the policy of the Commonwealth because it thwarted the operations of a Commonwealth agency or undermined a statutory right or obligation governed by a Pennsylvania statute. Unlike **Schick**, the circumstances of this case did not place Devore in the untenable position of having to decide whether to enforce a clear statutory right adopted by our General Assembly or forgo such a pursuit in order to preserve his employment with Metro. Put simply, if we set aside the broad declarations set forth in Section 8102(2), (4), and (5), DeVore offers nothing to show how any policy of this Commonwealth was violated because he was terminated after making a private report to Metro's headquarters.

DeVore's argument thus appears to be that, although the EMSS Act does not directly regulate Metro's behavior, it might do so indirectly by announcing a general policy applicable to all employers in Pennsylvania's emergency medical services system. We therefore will consider whether the policy

expressions contained in Section 8102, standing alone, create a common law cause of action for wrongful termination that is generally applicable to all employers engaged in the Commonwealth's emergency medical system.

DeVore's final argument represents a bold appeal to considerations of public policy. Essentially, he asserts that he is entitled to pursue judicial remedies because he acted in the best interests of the general public, as well as his employer, in assisting AHN's flight nurses in reconfiguring the EC-135 aircraft. Although DeVore maintains that his conduct should be protected because his intentions inured to the benefit of the public, the courts have not agreed with this view for several reasons. *See Geary*, *supra*;[12] *see also McLaughlin*, *supra*. First, most discharged employees can make the same claim, so the assertion does not align with our understanding that public policy exceptions to at will employment should be found only in few instances.[13]

_____

[12] *Geary* recognized that, "the potential for abuse of an employer's power of dismissal is particularly serious where an employee must exercise independent, expert judgment in matters of product safety." *Geary*, 319 A.2d at 178. DeVore distinguishes himself from Mr. Geary, arguing that, as a pilot, he possessed expertise in aircraft safety. *See* Devore's Brief at 26, n.6. Even if we assume that DeVore possessed the relevant skills, talents, and experience, as we must under our standard of review, we nevertheless conclude that Metro is entitled to relief as a matter of law.

[13] We hasten to add that DeVore cannot simply cite a generalized statement of public policy to support his common law claim of wrongful discharge. Instead, he must identify such a clear and unmistakable declaration of public policy that it supports an exception to the presumption of at will employment. *See McLaughlin*, 750 A.2d at 288-289 (noting a heavy burden incident to overcoming the presumption of at will employment where termination because
*(Footnote Continued Next Page)*

Second, we doubt that such an expansion of the public policy exception would operate universally to the benefit of the parties or of the public. Lastly, in rejecting a cause of action based upon the same type of internal reports that DeVore made at Metro, our Supreme Court said in **Geary** that "[t]he praiseworthiness of [the employee's] motives does not detract from the company's legitimate interest in preserving its normal operational procedures from disruption." **Geary**, 319 A.2d at 183 ("In sum, while we agree that employees should be encouraged to express their educated views on the quality of their employer's products, we are not persuaded that creating a new non-statutory cause of action of the sort proposed by [the employee] is the best way to achieve this result."); **McLaughlin**, **supra**. Without more concrete guidance from the legislature, we believe that "disturbing the [presumption of at will employment] would unwisely interfere with the legitimate interest of employers in hiring and retaining the best personnel available. The ever present threat of suit might well inhibit the making of critical judgments by employers concerning employee qualifications." **Geary**, 319 A.2d at 179 (internal quotations omitted).

As our previous cases have shown, Pennsylvania courts have acted cautiously when confronted with requests to set aside the presumption of at will employment. If it became the law that an employee may bring a wrongful

---

of internal reports has occurred but has not impeded the administration of a Commonwealth agency or impaired a statutory right).

discharge claim pursuant to the public policy exception to the at will employment doctrine merely by referring to generalized pronouncements about community interests offered by the General Assembly, the exception would soon swallow the rule. We therefore hold that a bald reference to general articulations of the public interest, in the absence of something more such as an adverse employment action which impairs a well-defined statutory right or impedes the function of a Commonwealth agency, is insufficient to overcome the strong presumption in favor of at will employment relationships. Accordingly, we vacate the July 19, 2022 judgment of the trial court and remand this matter with instructions to enter an order granting Metro's motion for a JNOV.

Judgment vacated. Case remanded with instructions. Jurisdiction relinquished.

Judgment Entered.

Benjamin D. Kohler, Esq.
Prothonotary

DATE: 11/18/2024